IN RE THE 1984 GENERAL ELECTION FOR THE OFFICE OF
COUNCIL OF THE TOWNSHIP OF MAPLE SHADE,
COUNTY OF BURLINGTON.

Superior Court of New Jersey
Law Division Burlington County

Decided April 24, 1985.

566

*John M. Carbone* for Ira W. Reese, II (*Carbone and Faasse*, attorneys).

*John Harrington* for Robert Fellner and William Lindsey (*Schlesinger, Scholosser, Foy & Harrington,* attorneys).

*Ronald Bookbinder* for Frank A. Troso (*Bookbinder and Guest,* attorneys).

*John Lee Madden* for Charles J. Ansert, Jr. and Richard F. Wild, Jr., (*John Lee Madden,* attorney).

## OPINION

HAINES, A.J.S.C.

This opinion, amplifying a verbal decision resolving an election contest, addresses the question of whether the judge hearing the matter acts judicially, and may therefore employ customary judicial powers, or acts as a legislative agent who may employ only such powers as are conferred by statutes, strictly construed. Phrased differently, can it be said that *courts* have jurisdiction over election contests? That question must be answered because the contest raises significant issues not addressed by the Election Law, which can be resolved

properly only through judicial action. Those issues include: (1) the consequences that follow the rejection of election results in a single election district; (2) the structure and voter qualifications to be established for a new election; and (3) the withdrawal rights of candidates.

*State v. Justices of Middlesex Cty.,* 1 *N.J.L.* 283 (Sup.Ct. 1794), our earliest case on the subject, held that courts had jurisdiction and therefore acted judiciously in election matters. The *New Jersey Constitution* (1776) Art. IX then provided that "the governor and council (seven whereof shall be a quorum) be the court of appeals in the last resort in all causes of law as heretofore...." This reflected English law, under which the Court of last resort was and is the House of Lords. 10 Lord Hailsham of St. Marylebone, *Halsbury's Laws of England,* 338 (4th ed. 1975). The case was appealed to that body, which reversed. A note that appears on the record of the case in the handwriting of the Chief Justice states:

> On January 7, 1795, on error before governor and council, this judgment was reversed, 8 to 3. I have heard that the ground of this reversal was that the Supreme Court had no jurisdiction. *Sed quere.* [at 295].

This scant authority apparently provided subsequent courts with the reasons to hold that judges hearing election matters sat as legislative agents and could not act judicially. The theory has persisted in disregard of substantial constitutional and statutory changes which have occurred since 1794 when *Justices of Middlesex* was decided.

This court reaches an opposite conclusion.

The facts in the present case involve the Sixth Election District in the Township of Maple Shade, a municipality in Burlington County with 19 such districts. In the general election held on November 6, 1984, three persons were to be elected to the Township's five member Council.

The election, (after a recount ordered pursuant to *N.J.S.A.* 19:28-1 *et seq.* was completed) produced the following municipal-wide results:

Republican

| Charles J. Ansert, Jr. | 4144 votes |
| Richard F. Wild, Jr. | 3811 votes |
| Ira W. Reese, III | 3787 votes |

Democrat

| Robert Fellner | 3646 votes |
| Frank A. Troso | 3822 votes |
| William Lindsey | 3780 votes |

Ira W. Reese, III, having been defeated by Frank A. Troso for the third seat on the council by only fourteen (14) votes, filed a petition contesting the latter's election pursuant to *N.J.S.A.* 19:29-2. The Democrat candidates, Fellner and Lindsey immediately filed a counter-petition contesting the election of all of the Republican candidates.

*N.J.S.A.* 19:29-1 provides that, the "election of any person to any public office ... may be contested ... e. [w]hen illegal votes have been received, or legal votes rejected at the polls sufficient to change the result...." At the trial of the contest, numerous "legal" voters from the Sixth District in Maple Shade testified that they had been "rejected at the polls." The court concluded that more than 14 such voters had been so rejected, a number "sufficient to change the result."

"Rejections" were caused by the breakdown at approximately 3:20 p.m. of the single voting machine used in the Sixth District. An election official immediately called the Superintendent of Elections to report the problem. He dispatched a truck with a new machine. The truck broke down on the way and the machine was never delivered. Meanwhile, the district election board commenced using paper ballots, supplied to it for emergency purposes. However, its small supply of these ballots was soon exhausted and more ballots were requested from the Superintendent. He dispatched a substantial number by messenger who became lost, as a result of which the additional ballots did not arrive until about 5:30 p.m. A repairman attempted to fix the machine shortly after the breakdown without success. A second repairman was equally ineffective. The machine was quite old with sagging interior machinery, partly corrected prior to delivery by what one witness described as a

"broomstick" used for a prop. The machine was repaired eventually, but not until 6:50 p.m.

During the 3 hours and 30 minutes during which the machine was inoperative more than 14 legal voters left the polling place without voting. Some appeared there more than once but were not able to vote. Others became discouraged and left immediately after seeing the long waiting line and learning of the machine difficulty.

The use of emergency paper ballots presented additional difficulties. The voting machine constituted the only booth in which voting could take place in privacy. It was not useful for the purpose of marking paper ballots and, in any event, could not provide privacy since the curtains on the machine could not be closed. Consequently, the paper ballots were marked on tables placed in the open at the polling place or in an adjoining room. No effort was made to provide privacy although it was testified that no intrusions or interference had taken place while any paper ballot was being used. After the paper ballots were voted, they were placed in an envelope provided by the Superintendent of Elections and returned to the County Board of Elections. These procedures violated the Election Law, adding substantial irregularities to those involving machine problems.

## I. Judge or Agent?

### A. History

When the *Justices of Middlesex* was decided, New Jersey's first Constitution, adopted July 2, 1776, was in force. That Constitution did not contain any provision for the separation of powers among the legislative, executive, and judicial departments of government. It did provide in Article I:

> That the government of this province shall be vested in the governor, legislative council and general assembly.

And in Article IX:

> That the governor and council (seven whereof shall be a quorum) be the court of appeals in the last resort in all causes of law as heretofore....

Articles IX and XII contained the only provisions relating to courts. The latter dealt only with terms of office for judges and others. The law to be followed by the courts was set forth in Article XXII:

> That the common law of England, as well as so much of the statute law, as have been heretofore practiced in this colony, shall still remain in force, until they shall be altered by a future law of the legislature; such parts only excepted, as are repugnant to the rights and privileges contained in this charter....

It was in this constitutional setting that *Justices of Middlesex* was decided. That case involved a challenge to the validity of an election, concerning which the court said:

> ... it is the duty if this court to review their proceedings, so far as to see that justice is done, and to vacate them if they have swerved from the legal line of their duty, or employed their authority for the purposes of oppression. [at 288]
>
> ....
>
> The court exercises a jurisdiction over the elections of officers chosen under an act or parliment, in public corporations, and even in the case of private trusts. The reason is the same—the power is necessary for the preservation of peace in the community—and with what color can it be pretended that this court, whose duty it emphatically is to take care that justice is done to everyone, has no power to protect the interest and redress the wrongs of an entire county?
>
> ....
>
> ... That the rights of electors, and that elections should be conducted fairly, are points upon which we cannot be too jealous. Whenever these rights are invaded; whenever a law intended to effectuate one purpose is perverted from its design, either by fraud or illegal practices, and made to subserve illegal and private purposes; or wherever allegations of this nature are substantiated by evidence, there is no man and no body of men elevated so high in society, as to be exempt from jurisdiction and supervision of some court.
>
> The basis on which this power is exercised, is a solid one, because necessary to the peace of the community, and without which the main design of government, to wit, protection, cannot be afforded. This interference, however, is itself limited and controlled by the laws of the land, subjected to a revision in the last resort by the governor and council, and it cannot do injury. [*Id.* at 292].

It was this assertion of jurisdiction that was apparently reversed by the Governor and Council according to Chief Justice Kinsey's handwritten note on the opinion which stated:

> Jan. 7, 1975, on error before governor and council, this judgment was reversed, 8 to 3. I have heard that the ground of this reversal was that the Supreme Court had no jurisdiction. *Sed quere.* [*Id.* at 295].

Since the 1776 Constitution provided that "the government of this province shall be vested in the governor, legislative council, and general assembly," and made the Governor and Council the "court of appeals in the last resort", the Supreme Court did not have the final word and the reversal, while barely explained, is understandable.

On September 2, 1844, a new Constitution became effective for New Jersey. Article III, par. 1, provided:

The powers of the government shall be divided into three distinct departments—the legislative, executive and judicial; and no person or persons belonging to or constituting one of these departments, shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided.

Article VI, § I, par. 1 provided:

The judicial power shall be vested in a court of errors and appeals in the last resort in all causes, as heretofore; a court for the trial of impeachments; a court of chancery; a prerogative court; a supreme court; circuit courts, and such inferior courts as now exist, and as may be hereafter ordained and established by law; which inferior courts the legislature may alter or abolish, as the public good shall require.

In view of these significant constitutional changes, there should have been no further doubt concerning the jurisdiction of the courts over election disputes. Decisions made after 1844, however, reasserted the old doctrine. In *State v. The Clerk of Passaic*, 25 *N.J.L.* 354 (Sup.Ct.1856), the court considered a challenge to an election for Surrogate in the County of Passaic. The court questioned its jurisdiction, saying: "whether the court has jurisdiction in such cases, has been frequently questioned, and is not free from doubt." *Id.* at 355, citing *Justices of Middlesex.*

*In re Margarum*, 55 *N.J.L.* 12 (Sup.Ct.1892), involved a request to the Supreme Court for an advisory opinion concerning an election petition presented to one of its justices. The petition had been presented in accordance with Section 52 of an act approved May 28, 1890, which supplemented the election laws. That section provided for the presentation of a verified petition containing statements showing "specified frauds or irregularities," directed the justice to investigate, hear and

determine the matter, and, if the allegations were sustained, to set aside the election. Thus, it was not substantially different from *N.J.S.A.* 19:29–1, pursuant to which the contest in the instant matter was filed. The *Margarum* court concluded that it had no jurisdiction because the justice who entertained the petition sat only as a "commissioner", *i.e.*, a legislative agent, not as a judicial personage. It said:

> It will be at once perceived, from this summary of this statutory clause, that the judge who is to determine the prescribed contest is not empowered for that purpose to sit in, or under the authority of, any court. The reference to him as "the justice of the Supreme Court holding the Circuit Court in and for said county," is a mere *designatio personae.* The expression evidently confers upon the official no authority, except such as is expressly prescribed, which is that he shall entertain the complaint in the capacity of a commissioner acting under and absolutely by the force of a statutory authorization. He is to determine the matter and make an order dismissing the petition or setting aside the election, and which order is to be filed with the clerk of the county. This is the entire scope and extent of the power expressly conferred, and it would not seem that, in such an affair, a justice of the Supreme Court has inherent in his office any ability that would materially subserve this statutory endowment. It is true that, as such justice, he is possessed of the statutory authority to take voluntary oaths and affidavits, but he could not compel the attendance of witnesses, nor could he punish their recusancy if they should refuse to be sworn. In the present inquiry it is not pertinent to consider the serious question whether this entire provision relating to this method of determining the legality of these elections, is not so imperfect and incomplete with respect to the power conferred upon the judicial officer who is to decide the controversy, as to render the provision itself wholly nugatory, all our immediate concern being to emphasize the fact that such justice in executing the function in question does not sit *in curia.* [*Id.* at 15].

The suggestion that the statutory provision might be "wholly nugatory" became a conclusion in *Roberts v. Shafer,* 63 *N.J.L.* 182 (Sup.Ct.1899), which court also said that "[b]y the statute *sub judice,* the justice sits as a commissioner and not in curia," citing *Margarum. Id.* at 184.

In *Clee v. Moore,* 119 *N.J.L.* 215 (Sup.Ct.1937), the court considered a contest involving a gubernatorial election. The court noted that the contest petition was filed in accordance with "[a]n act to regulate elections' (Rev.1930)," Article XXVI and "proceedings taken thereunder are purely statutory and

... the jurisdiction of the court is derived from the statute itself." *Id.* at 216.

*Burkett v. Francesconi,* 127 *N.J.L.* 541 (Sup.Ct.1942), stated that proceedings under *N.J.S.A.* 19:29–1 "are strictly statutory and that the statute must be rigidly followed." *Id.* at 543. *In re Donahay,* 21 *N.J. Misc.* 159 (Cir.Ct.1943), agreed.

None of these decisions discussed any change in the approach to the election laws which might have been required by reason of the adoption of the 1844 Constitution. They reflect the state of the law in 1947, when our present Constitution was adopted.

Article III of that Constitution provides for the separation of powers of government among the three "branches" thereof in language essentially the same as that contained in the 1844 Constitution. Article VI, the judicial article, is more elaborate. It provides that "the Supreme Court shall exercise appellate jurisdiction in the last resort in all causes provided in this Constitution". [§ II, par. 2]. It also provides that "the Superior Court have original general jurisdiction throughout the State in all causes." [§ III, par. 2].

Our statutory provisions relating to election contests, *N.J. S.A.* 19:29–1 *et seq.,* were adopted in 1930. They authorize the commencement of contest proceedings by filing a petition with the Clerk of the Superior Court, after which the matter is to be heard and determined by "a Judge of the Superior Court." [§ 2]. The "Judge" is to fix a time for trial. [§ 4]. "The proceedings shall be similar to those in a civil action so far as practicable, but shall be under the control and direction of the court...." [§ 5]. The "Court" is authorized to compel the attendance of witnesses and the production of election materials. [§ 6]. The "Judge" may compel a nonqualified voter to disclose for whom he votes. [§ 7]. "The Judge shall pronounce judgment whether the incumbent or any contestant was duly elected, and the person so declared elected will be entitled to his certificate...." [§ 8]. "If the judge finds that no person was duly elected, the judgment shall be that the election

be set aside." [§ 9]. The "Judge" is authorized to issue orders to carry into effect the judgment awarded. [§ 10]. The judgment may be reviewed by the Appellate Division "by appeal in lieu of prerogative writ" [§ 11], which court is further authorized "to enforce its judgment in such, however, as may be appropriate." [§ 13]. Liability for costs is left to the "discretion" of the "Court." [§ 14].

All of these statutes were adopted after 1844 and all were amended after 1947. It is presumed that the Legislature adopted and amended them with the applicable Constitutional provision in mind. *Jardine v. Bor. of Rumson,* 30 *N.J.Super.* 509, 519 (App.Div.1954). No Constitutional provision states that judges hearing election matters of any kind shall act as legislative agents, and no election statute so provides. No decision of any New Jersey court so holds since 1947 except *In re Recheck of Ballots in South River,* 27 *N.J.Super.* 109 (Law Div.1953) with which this court, later in this opinion, disagrees. *Justices of Middlesex* decided that courts had jurisdiction over election matters; it did not discuss the legislative-agency concept. The Governor and Council's apparent reversal shed no light on the agency concept. It appears, however, that those courts which erected and perpetuated that concept did so by reason of *Middlesex* translating the suggested absence of jurisdiction to mean that judges did not sit as such in election matters.

## B.  The Judge-Agent Analysis

■  The Legislature exercises paramount control over election matters and the courts are bound by its enactments. Justice Handler, in his concurrence/dissent in *Gormley v. Lan,* 88 *N.J.* 26 (1981), stated it as follows:

The greater the statutory and administrative responsibility that is vested in the executive or legislative agents over election matters, the more constricted is the jurisdiction of the courts. Judicial and executive responsibilities in election matters stand, as it were, in inverse proportion to one another. [*Id.* at 46].

The present quest does not ignore that principle. It seeks only to fix the role of the court when it addresses election problems requiring judicial solutions, *i.e.*, problems which have not been considered by the Legislature. It acknowledges the fact that some problems must be resolved by judges who sit, not as judges, but as agents of the Legislature because the Legislature has said so.

The difference between election recounts and election contests illustrates the difference between judges who are agents and judges who are judges. Recounts are covered by *N.J.S.A.* 19:28–1 *et seq.* contests by *N.J.S.A.* 19:29–1 *et seq.* Recounts involve judges only ministerially, as the officials who order recounts to be made. Only elementary decisions are required; the actual recounts are conducted by election officials. As a consequence the courts have referred to the judges who issue recount orders as legislative agents. *In re Election in Bethlehem Tp.*, 74 *N.J.Super.* 448, 459–460 (App.Div.1962); *In re Recheck of Machines in Jersey City*, 19 *N.J.Super.* 187, 189–190 (App.Div.1952) ("It is clear that the statutory jurisdiction conferred upon the judges of the Law Division of the Superior Court by *R.S.* 19:28–1, *et seq.*, is conferred upon them as individual judges thereof and is not conferred upon the court as such, and that the individual judge who acts in exercising such jurisdiction acts solely in the capacity of a legislative agent exercising a delegated authority."). *See also* the dicta in *Massett Bldg. Co. v. Bennett*, 4 *N.J.* 53, 60 (1950) and *In re Recheck of Ballots in South River, supra,* 27 *N.J.Super.* at 111. Election contests involve much more than ministerial actions of judges and invite the conclusion reached here that they are subject to the exercise of judicial power.

The question has been considered by three courts since our Constitution was amended in 1947. *In re Recheck of Ballots in South River* is the only court since then, however, which has faced the issue squarely. It decided that judges sit as legislative agents when addressing election contests, a conclusion with

which this court, as it may, since *South River* was a Law Division decision, disagrees. It held:

> Under *R.S.* 19:29–2, as amended by *L.*1953, c. 19, Sec. 33, the proceeding in question must be brought before "a Judge of the Superior Court" assigned to the county. Such an election proceeding, like a condemnation proceeding prior to *L.*1953, c. 20, comes before the judge of the Superior Court as a legislative agent and is not "in" the Superior Court. This has always been so as to a proceeding for a recount under *chapter* 218 of *Title* 19. And it may always have been so as to election contests. At any event the changes, made by *L.* 1953, c. 19, in *R.S.* 19:29–2, 19:29–4 and 19:29–7 to 10, substituting the word "judge" for "court," were designed to make the latter apparent. [*Id.* at 111: citations omitted].

*In re Election in Bethlehem Tp.*, which considered a recount challenge, seems to have disagreed. It said, by way of dicta insofar as election contests are concerned:

> Since the County Court judge was here sitting as a legislative agent under a *chapter* 28 proceeding, to determine whether the count of votes was correct, he could decide that any *ballot* was defective. It would have been improper for him to consider anything in relation to the *certificate* that had been attached to the inner envelope of an absentee ballot. Once the certificates had been detached from the inner envelopes, and the votes counted, exclusive jurisdiction of any dispute relating to the qualifications of an absentee voter or any certificate was vested in the Superior Court in a *chapter* 29 proceeding. [*Bethlehem Tp., supra*, 74 *N.J.Super.* at 459–460].

In *Massett Bldg. Co.*, not an election matter, the Supreme Court listed numerous statutes under which judges act as legislative agents. *Id.*, 4 *N.J.* at 59–60. One of them was the recount statute, now *N.J.S.A.* 19:28–1. The contest statute, significantly, was omitted.

Since our contest statutes, *N.J.S.A.* 19:29–1 *et seq*, were enacted in 1930, a consideration of the "legislative agent" cases decided between 1930 and 1947, during which time our 1844 Constitution was in place, is required. Three cases shed light on the present issue. They support, expressly, the ancient concept of legislative agent. They show what courts were doing in these cases. What they did was not what they said.

In *Clee v. Moore*, the court was asked to permit discovery in an election contest proceeding. The court, at first, clearly denied its judicial powers. It said:

... It has, however, been considered by the Supreme Court in a great many cases and in all of them where the occasion arose may be found unanimity of judgment that proceedings taken thereunder are purely statutory and that the jurisdiction of the court is derived from the statute itself. In the case of *Darling v. Murphy*, 70 *N.J.L.* 435 (at *p.* 436 ), Mr. Justice Swayze said, "the proceeding is purely statutory and, in order that the court may have jurisdiction, the statute must be complied with." [*Clee*, 119 *N.J.L.* at 216].

The opinion ended, however, on the following note:

Since, therefore, the proceeding is one of purely statutory origin, we are compelled to follow the statute strictly. Courts may not and should not invoke their general or inherent jurisdiction in a proceeding strictly statutory when the terms of the statute invoked provide ample means to bring into court whatever proof exists in support of statutory petition. [*Id.* at 218].

Thus suggesting, as here, that courts may invoke their inherent jurisdiction when statutes fail to provide "ample means" for relief. The court, notwithstanding these statements, undertook a judicial analysis of the statutes and held, as a court, that it had no power, as a court, to compel discovery.

Next came *Burkett v. Farrell,* which cited *Clee* and said: "these proceedings are strictly statutory and ... the statute must be rigidly followed." *Burkett, supra,* 127 *N.J.L.* at 543. There was, however, no statute to follow in deciding whether to set aside an election result in the four districts where fraud was found or in the entire county in a county-wide election. Nevertheless, the court, creating a judicial remedy, held that it would be an "absurdity" to set aside the entire election. It pursued the judicial function of distinguishing certain prior cases in reaching that conclusion.

*In re Donahay* also cited *Clee* and said "this proceeding is purely a statutory one." *Donahay, supra,* 21 *N.J.Misc.* at 162. The court nevertheless undertook to interpret the statutes and permitted the filing of a counterclaim although no express provision of the election laws authorized one to be filed. Reliance was placed upon *N.J.S.A.* 19:29–5, which provides that "proceedings shall be similar to those in an action at law so far as practicable...." The court, in finding legislative intent, considered its judicial role to be a broad one, concluding that:

... by these statutes, the legislature had intended to, and did, empower the Circuit Court in an election contest, to ascertain the merits and the justice of a dispute between a contestant and an incumbent: [*Id.* at 163].

The fact that actions have spoken louder than words in our cases is not a circumstance restricted to the 1930–1947 decisions. It can be said with reasonable probability that it is true of all of our cases dealing with election contests. A few of our later cases illustrate the point.

*In re Petition of Hartnett,* 163 *N.J.Super.* 257 (App.Div. 1978), required the court to resolve questions of residence and domicile for voting purposes in an election contest case. It considered and distinguished cases relied upon by the trial court. These were judicial actions. *Application of Wene,* 26 *N.J.Super.* 363 (Law Div.), *aff'd* 13 *N.J.* 185 (1953), decided whether or not a contest petition was sufficient as a matter of law, a judicial decision. *Application of Murphy,* 101 *N.J.Super.* 163 (App.Div.1968), decided questions concerning the burden of proof. It interpreted statutes. *In re Keogh-Dwyer,* 85 *N.J.Super.* 188 (App.Div.1964), *rev'd* on other grds. 45 *N.J.* 117 (1965), interpreted statutes, reviewed and distinguished cases and noted that *N.J.S.A.* 19:29–5 "gives the trial court broad powers in the control and direction of the proceedings...." *Id.* at 202. Even *In re Recheck of Ballots in South River,* where the court decided that chapter 29 judges sat as legislative agents, a judicial decision was reached as to whether a hearing could be held, interpreting rules and statutes for that purpose.

■ The pre-1947 cases, with the exception of *Justices at Middlesex,* were decided by the then Supreme Court or by courts on a lower level of our judicial hierarchy. The Supreme Court was not then "supreme"; our court of last resort was the Court of Errors and Appeals. The Court of Chancery was on a level at least as high as that of the Supreme Court. The Law Division of the Superior Court, by virtue of the 1947 Constitution, possesses the powers of the Court of Chancery and is exercising them in this case in providing equitable solutions to the problems of the Maple Shade election. For present pur-

poses, therefore, it stands at the level of the former Court of Chancery, which would not have been bound by the decisions of the former Supreme Court, which, among other things, did not have jurisdiction over matters of equity. Consequently, this court is not bound by decisions of the latter, with respect to the use of equitable remedies, on any principle of stare decisis. The pre-1947 decisions of the former Supreme Court, in which judges were referred to as "legislative agents," have been undermined by the judicial decisions, not only of later courts, but of the very courts that used the agency language, as noted above. In view of these circumstances, this court is not obliged to follow the old decisions. *State v. Ciuffini,* 164 *N.J.Super.* 145, 152 (App.Div.1978). Those decisions, in effect, acknowledged the clear necessity for providing judicial relief when addressing election contests. In that connection, they make the term "legislative agent" an exercise in semantics.

*Justices of Middlesex,* aside from the problem of its age, is unreliable as precedent. Its legitimacy, for that purpose, depends upon a marginal notation supposedly reflecting an unreported decision of the Governor and Council in 1794. It does not speak in terms of "legislative agent." It is not a case that invites application of the rules of stare decisis. *Kass v. Brown Boveri Corp.,* 199 *N.J.Super.* 42 (App.Div.1985).

"Stare decisis" is a principle of adherence, for the sake of certainty and stability, to precedents once established, but it applies primarily to decisions ... which invite reliance and on the basis of which men order their affairs, *e.g.,* "in the field of contract or property rights." *Smith v. Brennan,* 31 *N.J.* 353, 361 (1960). Can it be said that the voters who were turned away in Maple Shade and the election officials who turned them away did so in reliance upon the decisions of our former Supreme Court holding that judges will sit as legislative agents in deciding election contests? Did irregularities occur because of such reliance? The answer is clearly no. Further, if there was reliance, it would have been placed on the words,

not the deed of the former Supreme Court. It is also to be seen as will be shown in the later discussion of the remedies to be provided here, that there are conflicting decisions concerning the effect of rejecting the election results in a single district (Should a new municipal-wide election be held? Should the district be eliminated when counting the votes of the entire electorate?), making reliance difficult. Finally, the solutions provided by this court turn, in part, upon vacancy laws adopted in 1979 and not previously interpreted in the instant context. For all of these reasons, this court is of the opinion that it is not bound by prior decisions of our courts with respect to the legislative agent issue.

The provisions of chapter 29 (election contests) do not require a different result. *In re Recheck of Ballots in South River* relied upon 1953 amendments, which substituted "judge" for "court" in sections 2, 4, 7, 8, 9, and 10 of that chapter. However, section 2 still provides that the "court" shall be "construed to have acquired jurisdiction to hear and determine such contest" if certain security is posted. Most significantly, section 5 was not changed. It provided and still provides:

> The proceedings shall be similar to those in a civil action so far as practicable, but shall be under the control and direction of the court, which shall hear and determine the matter without a jury, with power to order any amendments in the petition, or proceedings as to form or substance, and to allow adjournments to any time not more than thirty days thereafter for the benefit of either party, on such terms as shall seem reasonable to the court, the grounds for such adjournment being shown by affidavit.

This is a description and conferral of judicial power. Section 6 was also unchanged; it authorizes the "court" to compel the attendance of witnesses and the production of evidence. Again, the power thus delegated is usual to a judicial proceeding; the reference is to a "court", not a "judge." Section 7 continues to refer to "court" although it also refers to "judge" as noted in *South River*. The same is true of section 10 insofar as it requires the order of the "judge" to be "under the seal of the court." Thus, the changes in chapter 29 upon which *South River* relied are balanced by the language that was not changed

and largely denied significance by the retention of the sweeping judicial authority provided by section 5.

*N.J.S.A.* 19:29–11 provides: "The party against whom judgment is rendered may have it reviewed by the Appellate Division of the Superior Court on an appeal in lieu of prerogative writ." This merits a pause in our present pursuit since actions in lieu of prerogative writ are frequently used to enforce or attack non-judicial decisions, such as those involving election recounts which, concededly, are undertakings of legislative agents. It may be argued, therefore, that this section of chapter 29 requires a conclusion that election contests do not invite judicial action. However, no Rule authorizes an "appeal" by a prerogative writ proceeding. Our Constitution, Art. VI, Sec. III, par. 3 states that the Appellate Division shall "hear such causes as may be provided by rules of the Supreme Court." The Legislature cannot have intended to enact an unconstitutional provision. It has done so, however, if section 11 is read as imposing a rule of appellate procedure upon the courts, since it would then violate, not only the above clause, but also constitutional provisions regarding separation of powers. That conclusion should be avoided. "In construing a statute the presumption is that the legislature acted with existing constitutional law in mind and intended the act to function in a constitutional manner." *Lomarch Corp. v. Englewood,* 51 *N.J.* 108, 113 (1968). Section 11 becomes constitutional if its reference to "prerogative writ" is ignored. It must be. The obvious intent of the Legislature was to provide for an appeal to the Appellate Division in an election contest. The prerogative writ reference is unintended and unnecessary. It should not be considered. Reading the statute in a way that omits those words is no different than the technique of construction used in *Lomarch,* which required, in effect, the addition of language in order to make an enactment constitutional.

The appellate procedure authorized by *N.J.S.A.* 19:29–11 also constitutes recognition that judges sit as judges in hearing

election contests since, if they sat as agents, their decisions would have to be challenged by a prerogative writ action in the Law Division, not by an action in the Appellate Division. *In re Recheck of Machines in Jersey City, supra*, 19 *N.J.Super.* at 190.

There are very realistic reasons for reaching the conclusion that judges hearing election contests are authorized to act judicially: the exercise of judicial power represents the only way in which necessary decisions can be made as to the meaning of statutes and the structuring of appropriate relief when none is provided. The present case illustrates the problem. No statute makes any provision as to what must be done when the results of a municipal-wide election are set aside in a single district. The solution arrived at in the Maple Shade contest is analyzed below. There would have been no solution, however, absent judicial authority to consider equitable remedies.

■ The exercise of this judicial authority is one designed to complement legislative intent. It is a function the Legislature expects courts to perform. Tate, *The Law-Making Function of the Judge*, 28 *La.L.Rev.* 211 (1968) explains:

> Where legislation represents a fully integrated and comprehensive scheme of regulation, such as the Uniform Commercial Code, the courts cannot and should not weigh policy considerations or use creative interpretation in the application of the statutory command. But much legislation is piecemeal, sometimes hastily or inadvertently drafted, often without consideration of competing or overlapping or inconsistent enactments. In these instances, the courts must perform, and the legislature intends for them to do so, the function of integrating the interpretation of the statute into the general body of the law, or coordinating its principle with others applicable, and of limiting the statute or extending it according to its intended purpose (for the literal words often permit either broad or narrow applications, the circumference of the statute not being discernible from the words themselves). The courts are thus contemplated as a complementary law-making institute to rationalize isolated statutes in accord with their intended purpose and to permit them to serve as reasoned principle within a coherent and intelligible framework of general law. [*Id.* at 217–218].

These conclusions must now be applied to the issues arising from the Maple Shade election.

## II. The Election Irregularities

### A. In general

According to one election official, the voting procedures in the Sixth District amounted to a "disaster." The testimony supports that assessment. Because of the breakdown, there was no voting machine available for about 3 ½ hours. Paper ballots were not offered to waiting voters, despite the breakdown, between 3:20 and 4:p.m. by reason of instructions from the Superintendent of Elections. Election officials were required to encourage voters to wait for any machine repair and to use ballots only if absolutely necessary. After ballots were offered the modest supply on hand was quickly exhausted. None was available between 4:30 and 5:30 p.m. Numerous voters waiting in line were not told that paper ballots were available. Indeed, not a single voter who testified, and there were such witnesses, had been made aware of that alternative voting arrangement. Had they been told it is reasonable to believe that some would not have left the polls without voting. Nevertheless, 79 persons did vote by paper ballot. Unfortunately, all of these ballots were invalid, having been voted and transmitted in a manner not permitted by the Election Laws.

These problems, repeatedly confirmed by a parade of witnesses, were serious and sufficiently pervasive to permit the inference that more than the persons testifying were turned away. Whether or not that was so, the irregularities raise substantial questions about the validity of the election results in the Sixth District.

More than 14 voters testified to the fact that they did not vote by reason of these irregularities. Most made a real effort to cast their votes. Some were discouraged more easily than others. It is entirely clear, however, that those voters who were present at the polls would have voted except for the irregularities. I find this to be so even with respect to one voter who testified that he probably would not have waited to vote, even if the machine had been operating. His failure to

vote was caused by the promise implicitly conveyed by the long line of voters ahead of him, that there would be a voting delay of unknown duration. The line was caused by the failure of the machine and the failure of responsible officials to provide those waiting with a working machine or paper ballots. The ballot alternative should have been available as soon as the machine broke down and certainly after it became apparent that the machine could not be fixed quickly, a circumstance reasonably clear after 15 or 20 minutes had passed. The District Board members had an obligation to advise the waiting voters of the problems and the alternatives. Their failure to do so in a way reasonably calculated to reach all voters who came to the polls was an irregularity that contributed to the failure of some voters to vote.

These conclusions are not spelled out in the statutes. *N.J.S.A.* 19:15–1 merely provides that district boards shall "hold and conduct all elections at which the method of voting hereinafter prescribed shall be observed." *N.J.S.A.* 19:6–30 gives them the power to "direct the police on duty to maintain regularity and order, and to enforce obedience to their lawful commands during their sessions ...." *N.J.S.A.* 19:6–16 provides that: "Any policeman ... shall, under the direction of the board, enforce the election laws, maintain order, peace and quiet during the hours of registry and election ...." No legislation describes any advisory powers the boards may have and none sets forth the manner in which they are required to act or the nature of the control they must exercise during an election. However, the statutory obligation of election boards to "conduct all elections," as well as their directory power over the police to see that elections are conducted in a regular and orderly fashion, must be read as providing the necessary power as well as the obligation to afford all legal voters who wish to vote the opportunity to do so. This reading satisfies the court's judicial responsibility to interpret statutes in a way that is "consonant with the probable intent of the draftsman 'had he anticipated the situation at hand.'" *AMN, Inc. v. So. Bruns-*

*wick Tp. Rent Leveling Bd.*, 93 *N.J.* 518, 525 (1983), quoting *Jersey City Chap. of Prop., Owners etc. Ass'n v. City Council*, 55 *N.J.* 86, 101 (1969). It is also supported by two cases holding that "malconduct" includes "failure to follow affirmative statutory requirements." *Magura v. Smith*, 131 *N.J.Super.* 395, 399–401 (Law Div.1974); *Richards v. Barone*, 114 *N.J.Super.* 243 (Law Div.1971)

### B. Emergency Ballots

A judicial construction of the election statutes is also necessary with respect to the use of paper ballots in the Maple Shade election. *N.J.S.A.* 19:48–3.13 provides that: "No ballots other than ballots required for use in voting machines shall be prepared or used at any election in any election district in any county for which voting machines are available...." This appears to be contradicted by *N.J.S.A.* 19:48–7, which provides, in part, that: "Unofficial ballots made as nearly as possible in the form of the official ballot may be used, received by the election officers and placed by them in a ballot box in such case to be provided as now required by law, and counted with the votes registered on the voting machine." Furthermore, *N.J. S.A.* 19:15–5 & 6 permit the use of emergency paper ballots when regular ballots are not delivered, or are destroyed or when their supply is exhausted. *N.J.S.A.* 19:48–3.13, while enacted after these statutes referring to unofficial and emergency ballots, do not mention them. Nevertheless, all three statutory provisions should be read together. *Millman v. Kelly*, 171 *N.J.Super.* 589, 597 (Law Div.1979). *See also Axtell v. Caputo*, 85 *N.J.Super.* 80 (App.Div.1964), which reached the same conclusion without discussing the issue.

*N.J.S.A.* 19:48–3.13 cannot be read as emasculating the statutory provisions relating to emergency paper ballots. Were that to be done, there would be no voting arrangement available in case of a machine breakdown. Voters would be disenfranchised. Election statutes are to be construed so as to

produce the opposite result. *Wene v. Meyner*, 13 *N.J.* at 197 (1953). In that case the Court also said:

> A statute is not to be given an arbitrary construction, according to the strict letter, but rather one that will advance the sense and meaning fairly deducible from the context. The reason of the statute prevails over the literal sense of terms; the manifest policy is an implied limitation on the sense of the general terms, and a touchstone for the expansion of narrower terms .... [*Id.*].

*N.J.S.A.* 19:48–3.13 can be read as applying only to regular, not emergency, paper ballots. It must be so read in order to satisfy the principles set forth in *Wene* and the purposes of the Election Law.

▮ It therefore follows that the use of emergency ballots in the Maple Shade election was permissible. Unfortunately, however, those ballots were not used properly.

### C. Voting Booths

The statutes with respect to voting booths are specific. *N.J. S.A.* 19:15–26 provides:

> Every voter to whom a ballot is given shall thereupon retire into the polling booth. Not more than one voter, except as hereinafter provided, shall be permitted to enter or be in the same booth, at one time. The voter shall prepare his (sic) ballot in the booth secretly and screened from the observation of others.
>
> Any person or voter who shall violate the provisions of this section shall be deemed guilty of a misdemeanor and shall be punished by a fine not exceeding five hundred dollars or by imprisonment not exceeding one year or both at the discretion of the court.

▮ The voting procedures used in the Sixth District permitted 79 voters to violate this statute. They did not vote in a booth and were not screened from observation. In fact, no booth other than the booth that is part of the voting machine itself was provided in the Sixth District.

### D. Ballot Boxes

▮ Paper ballots must be placed in ballot boxes after being marked. *N.J.S.A.* 19:15–32. There are numerous references to ballot boxes in our statutes, e.g., *N.J.S.A.* 19:15–11 & 12. One such provision was adopted as late as 1967. *N.J.S.A.* 19:6–16.

They are required even though voting machines are in use. *N.J.S.A.* 19:48–7. The Sixth District did not use a ballot box because none was furnished for the Election Board's use.

### E. Envelopes

■ *N.J.S.A.* 19:15–4 provides in part that election boards "shall keep no ballots in the polling booths and shall not permit the use of envelopes for enclosing ballots on election day." This statute was violated by the Board when marked paper ballots were forwarded to the County Board of Elections in an envelope supplied by the Superintendent of Elections for that purpose.

### F. The Legal Votes Rejected

■ The election law provides that, in an election contest, if it is shown that there were "legal votes rejected at the polls sufficient to change the result," the election may be contested. *N.J.S.A.* 19:29–1. The statute itself does not require the election to be set aside; it is, however, the result accepted by our courts. *In re Petition of Hartnett,* for example, held that:

> When dealing with the malfunction of a machine which affects the will of a substantial number of voters, the election takes on the aura of uncertainty and unfairness calling for judicial intervention. And if the evidence supports a finding that sufficient numbers were prevented from voting for reasons beyond their control so as to create the potential of a different result, the election should be set aside. [*Id.* at 268].

It is not necessary to show how the rejected voters would have voted. *In re Application of Abbott Low Moffat,* 142 *N.J.Super.* 217 (App.Div.1976). The contrary is true with respect to votes cast which were illegal. *Hartnett,* 163 *N.J.Super.* at 266; *Application of Murphy,* 101 *N.J.Super.* at 167 (App.Div.1968), *certif. den.,* 52 *N.J.* 172 (1968). In the present case there has been no showing as to how the 79 improperly cast ballots were marked and they cannot therefore be said to have a capacity for changing the result. Nevertheless, the manner in which they were voted is a consideration in assessing the validity of the election in the Sixth District.

An argument is made that the failure of at least some of the "rejected" voters to vote was the fault of the voters, not the District Board, that the voters should have tried harder. Obviously, a voter who fails to vote because instant access to a polling booth is not provided cannot claim "rejection" under the election contest statute. The term "rejection" has been defined "to include any situation in which qualified voters are denied access to the polls including a denial because of shutdown of a voting machine." *Magura v. Smith,* 131 *N.J.Super.* at 399 (Law Div.1974). Moreover, the totality of the circumstances must be examined in order to decide whether the election irregularities were so significant that they impermissibly restricted voting opportunities and caused the results of the election to be questionable. Here, if 14 legal voters were "rejected" in the Sixth District, it is "sufficient to change the result." More than 14 voters who did not vote testified in this matter. They did not vote because of the unacceptable delay in providing them with any way to vote and the failure to provide them with adequate advice on the basis of which they could make reasonable voting arrangements. Clearly, they were "rejected" and the election result must be set aside.

## III. Structuring the New Election

### A. The Sixth District only

The conclusion that the election must be set aside raises the immediate question as to whether it is to be set aside in only the Sixth District or in the entire municipality and whether a new election is necessary. The Election Law provides no guidance. The cases are at odds.

One school of thought is found in *Burkett v. Francesconi:*

Proof of fraud under our law requires that the ballot be invalidated and where fraud has been perpetrated in an election district by the officers of election, or permitted by them to such an extent and character that the correct and genuine result cannot be .determined with reasonable certainty, the entire result from that district should be rejected. [*Burkett, supra,* 127 *N.J.L.* at 544].

The court then discussed the question of whether the entire election should be set aside or only the election in the districts in which fraud was found. It distinguished cases setting aside the entire election on the ground that they reflected circumstances of general fraud. It then stated:

> The parties here were voted for throughout the entire county and the vote in four districts only in the City of Camden was successfully challenged. To void a countywide election because of the existence of fraud in four election districts is an absurdity. [*Id.* at 546].

The court did not say why it would be an "absurdity" to set aside the entire election. *See also In re Donahay,* 21 *N.J.Misc.* 159.

The only other judicial discussion of the district-entire election question is contained in dicta found in *In re Bonsanto's Application,* 171 *N.J.Super.* 356 (App.Div.1979):

> Where irregularities at an election are such that the court cannot with reasonable certainty determine who received a majority of the legal votes, the election should be set aside. A corollary proposition is that when, by reason of irregularities in a particular election district, the correct and genuine result cannot be determined with reasonable certainty in that district, the entire result from that district should be rejected. In such case the election is determined on the vote in the balance of the districts. [*Id.* at 360–361; citations omitted].

*Bonsanto* involved registration questions and alleged improper assistance to handicapped students. It reversed the award of a summary judgment by reason of factual disputes. It cited *Burkett.*

Some cases have held that entire elections should be set aside but none has discussed the alternative of setting aside only the district election or the consequences of so doing. *In re Application of Dorgan,* 44 *N.J.* 440 (1965); *Hartnett,* 163 *N.J.Super.* at 257 (assumed entire election should be set aside); *Moffatt,* 142 *N.J.Super.* at 226 (issue raised but not addressed).

*Burkett,* for reasons stated above, is not binding upon this court. Furthermore, it is distinguishable. It involved fraud. No fraud was involved here. It did not consider the question of whether a new election should be held in the challenged districts. That proposition is novel. *Bonsanto,* of course, is not

binding because it is dicta. Further, it did not consider holding a new election in only one district.

     There are good reasons to require (1) a setting aside of the election in the Sixth District only and (2) the holding of a new election in that District instead of simply eliminating its votes when counting the municipal totals. Only the election in the Sixth District was challenged. No irregularities have been shown to have occurred in any other Maple Shade district. If the entire municipal election is set aside, the time, effort, and expense of candidates, officials and voters who participated in 18 entirely bona fide district elections will have been wasted. The voters in those districts will be disenfranchised, at least temporarily, and be obliged to duplicate their voting arrangements, if they are able to do so. That would not be equitable.

It would be even more inequitable to eliminate the Sixth District votes when counting the municipal totals. Those votes may change the result of the entire election. The voters in that District, if we ignore any intended violation of the statute requiring booths to be used when voting (and no such intent on the part of the voters was shown), did nothing wrong. If their votes are to be ignored, every voter in that District will have been disenfranchised. Most of those voters cast legal ballots. Fraud may have been a valid reason for refusing to count any votes in the districts that were challenged in *Burkett*, especially fraud so widespread that in two districts 816 tampered ballots were identified out of a total of 864. There was no fraud in the Sixth District.

The Legislature cannot have intended these results. Principles of equity as well as rules of statutory construction demand more. The election laws are designed to insure fairness in the electoral process and in election contests as well. My obligation, acting judicially, is to so decide this matter as to lay down rules that prevent fraud, secure justice and insure an opportunity for the establishment of the true will of the electorate. *Wene v. Meyner, supra.*, 13 *N.J.* at 197. That obligation,

when discharged, obviously implements legislative intent. It follows, therefore, that only the election in the Sixth District must be set aside and that a new election must be held in that District only. The conclusion addresses a specific situation not contemplated by our statutes in a way that they would have been addressed had they been considered. This is an appropriate exercise in judicial authority. *AMN, Inc., supra,* 93 *N.J.* at 525; *Wene, supra,* 13 *N.J.* at 197. It also applies the equitable principal that there should be a remedy for every civil wrong and, if the law gives none, equity may take jurisdiction in order that what is right may be done. *Supreme Council of Royal Arcanum v. Britton,* 46 *N.J.Eq.* 102 (Ch.1889), *aff'd,* 47 *N.J.Eq.* 325 (E & A 1890); *Crane v. Bielski,* 15 *N.J.* 342 (1954).

### B. Candidates and Voters

This conclusion does not resolve all problems. Questions are raised as to what candidates must run and who may vote in the new election. The answers to these questions are shaped somewhat by my opinion that this election should resemble as nearly as possible the election held on November 6, 1984. This was the approach approved in *Buonanno v. DiStefano,* — *R.I.* ——, 430 *A.*2d 765 (1981), which also considered the two alternatives mentioned here but agreed that the State Board of Elections acted properly in holding a new election limited to two election districts in the city of Cranston, Rhode Island. The issue has not been considered by any New Jersey court. The elections in every district in Maple Shade except the Sixth are controlled by the conditions which existed on that date. No municipal-wide election, such as this one is, could take place under unusual circumstances with different voting arrangements in different districts of the same municipality. Uniformity is essential, not only to comply with our election laws, but also to meet practical considerations. A departure from the norm is permissible only in exceptional circumstances such as those presented when a new election is held in one district. The departure should be as limited as possible.

(1) The Candidates.

N.J.S.A. 19:29–1 states that

The ... election of any person to any public office ... may be contested ... upon 1 or more of the following grounds: e. When illegal votes have been received, or legal votes rejected at the polls sufficient to change the result. ...

Consequently, the candidates who must run again in the Sixth District are limited to those who were challenged successfully in the election contest and to their challengers. There were 6 candidates, all of whom were either challenged or challengers: Troso, Lindsey, Wild, Reese, Fellner and Ansert. The initial contest was filed by Reese against Troso. Fellner, Lindsey and Troso responded by filing a contest against Wild, Reese and Ansert. The vote totals for the entire municipality were as follows:

| | |
|---------|------|
| Ansert  | 4146 |
| Wild    | 3814 |
| Troso   | 3804 |
| Reese   | 3790 |
| Lindsey | 3772 |
| Fellner | 3650 |

Thus, only 14 votes separated Reese, the first challenger, and Troso.

At trial, the Reese case proceeded first; hence, the effort to prove that at least 14 voters were turned away. Nevertheless, the court ruled that the contests would be tried simultaneously, that the Fellner, Lindsey, Troso contest could not be withdrawn after the proceedings commenced in order to gain some tactical advantage, nor would any advantage be permitted to accrue by reason of one contest being tried before the other. Gamesmanship of that kind has no place in an election contest that is designed to insure fairness in the election proceedings and an election result which reflects the will of the people.

Reese proved that more than 14 legal voters were rejected at the polls. This required a new election as to Reese and Troso since that was a sufficient number to change the result of the election. It was also sufficient to change the result as to Wild who was only 10 votes ahead of Troso, thus requiring a new

election as to all the remaining candidates except Ansert. Ansert was ahead by 332 votes; the proofs fell far short of showing that enough legal votes were rejected to change the result of his election.

Shortly after the trial ended and the court reached the conclusion that Ansert would not be a candidate in the new election, Fellner announced that he was withdrawing as a candidate. His presence on the ballot meant that 3 Democrats would be running against 2 Republicans creating the disadvantageous prospect of a split vote for the Democrats. The County Clerk, who was preparing the ballot for the special election, refused to permit the withdrawal on the ground that it was not authorized by statute and, in any event, was not permissible since he had been a candidate in the general election. The issue was presented to the court by way of amendment to the contest petition, the County clerk being added as a party by additional amendment.

No statute compels a candidate to run for an office to which he has been nominated. On the other hand no statute provides for the deletion of his name from the ballot under present circumstances. Were the question raised in the context of a nomination by direct petition for election to office at a general election, it would be answered by *N.J.S.A.* 19:13–16, which permits a written declination at least 40 days before the day of the election. Here, there is no opportunity for Fellner to follow that procedure. He was not so nominated and is to have his name placed upon the ballot for the new election only because of this court's decision addressing novel issues, the resolution of which he could not reasonably have anticipated. He did file a written declination with the County Clerk over 40 days before the date of the new election and applied to this court for relief within the same time. There is no other route he could have followed. It is not fair, nor could it have been intended by the Legislature, that he be denied the right to have his name removed from the ballot under these circumstances. He is

therefore advised that he may do so and the County Clerk is ordered to honor his request.

## (2) The Voters

Further questions have arisen as to what voters may vote at the new election. Some candidates have been registering new voters in the Sixth District since the new election was announced. Those voters are not qualified to vote in that election. The new election is intended to echo the November 6th election as nearly as possible. These voters could not have voted then and should not be permitted to vote now. An opposite response must be given with respect to certain voters who have received notices from the Superintendent of Elections that they cannot vote in the new election because their registrations expired as a result of their failure to vote in any election for four years as of December 31, 1984 and it is too late for them to reregister for the new election. *N.J.S.A.* 19:31–5. Some of these voters attempted to vote on November 6th, 1984. At least one was among the witnesses at the trial of this matter. Had they voted their registrations would not have expired. They will be permitted to vote in the new election upon filing proof in affidavit form with the Superintendent establishing the fact that they were rejected at the polls on November 6th.

Finally, there is a problem with absentee ballots. Those ballots cannot be identified by district and are counted separately. Consequently, if the voters who used those ballots are permitted to vote again at the new election, their votes will be counted twice. This would be entirely improper. The only possible approach is to prohibit any voter who received an absentee ballot for the November 6th election from voting in the new election, unless that voter failed to use the ballot so provided.

IV. The Vacancy Statutes

The final issue to be disposed of in connection with the decision to call for a new election is whether that is proper under the statutes relating to vacancies in municipal governing bodies. Two vacancies exist in the membership of the governing body of Maple Shade as a result of setting aside the election in The Sixth District of Maple Shade. If the vacancies occurred pursuant to the provisions of *N.J.S.A.* 40A:16–3, because of "being so declared by virtue of a judicial determination," *N.J. S.A.* 40A:16–5 requires them to be filled by appointment or at the next general election. On the other hand, if they occurred pursuant to the provisions of *N.J.S.A.* 19:3–25, because the election of two candidates "has been declared null and void," the provisions of *N.J.S.A.* 40A:16–16 require them to be filled by a special election. It is apparent that these provisions are indistinguishable. That seems doubly so when it is seen that *N.J.S.A.* 40A:16–3 contains the additional proviso that the offices are deemed vacant "upon a determination that the office comes within the purview of *N.J.S.A.* 19:3–25."

*N.J.S.A.* 40A:16–3 was adopted in 1979. *N.J.S.A.* 19:3–25 was enacted in 1930. It could therefore be argued that the later statute is controlling. *Newark v. Dept. of Civil Service,* 68 *N.J.Super.* 416, 427 (App.Div.1961). It appears, however, that this approach adds nothing to the search for legislative intent since the later statute incorporates the former as a basis for declaring an office to be vacant. That circumstance, however, leads to a sensible conclusion. The 1979 law was enacted as a part of comprehensive legislation intended to consolidate and modernize all laws relating to vacancies in municipal offices. It recognized *N.J.S.A.* 19:3–25 as a basis for a declaration that a vacancy existed, thus keeping its provisions alive. At the same time, it provided an additional basis for so declaring: a "judicial determination." The two provisions must be read as having independent, though related, meanings. Courts are to avoid constructions which make statutory provi-

sions redundant. *Mentus v. Irvington,* 79 *N.J.Super.* 465, 474 (Law Div.1963). Furthermore, "all provisions of a statute are to be related and effect given to each if that be reasonably possible." *Jamouneau v. Harner,* 16 *N.J.* 500 (1954). Therefore, a vacancy caused by a determination that *N.J.S.A.* 19:3–25 applies is not to be treated in the same way as a vacancy created by a "judicial decision", *i.e.,* a decision based upon some premise not involving *N.J.S.A.* 19:3–25. Here, the decision was reached in an election contest. Title 19 is controlling and *N.J.S.A.* 40A:-16–16 applies; a special election is required in order to fill the vacancy.