605 A.2d 1164

IN RE THE GENERAL ELECTION OF NOVEMBER 5, 1991 FOR THE OFFICE OF TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MAPLEWOOD, ESSEX COUNTY, STATE OF NEW JERSEY.

Superior Court of New Jersey
Law Division Essex County

Decided February 18, 1992.

694

---

*John M. Carbone* for petitioner Noel S. Siegel (*Carbone and Faasse,* attorneys).

*Thomas M. McCormack* for respondent Gerard W. Ryan (*Whipple, Ross & Hirsh,* attorneys; *Thomas M. McCormack* and *Susan K. Straub,* on the brief).

*David Dembe,* Deputy Attorney General, for respondents Essex County Board of Elections and Essex County Superintendent of Elections (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*Norman Schulaner* and *John Lyons, Jr.,* Assistant Essex County Counsels, for respondent Patricia McGarry Drake, Essex County Clerk (*Stephen J. Edelstein,* Essex County Counsel, attorney).

## OPINION

VILLANUEVA, J.S.C.

### PROCEDURAL HISTORY

On November 5, 1991, the Township of Maplewood held an election to fill two seats on the five-member Township Committee. Four candidates ran for these seats. Robert H. Grasmere received 3,410 votes, Gerard W. Ryan received 2,973 votes, Noel S. Siegel received 2,968 votes and Stephen R. Gruchacz received 2,602 votes.

On November 14, 1991, Siegel applied for and received the right to a recount under *N.J.S.A.* 19:28–1. During this recount the Essex County Board of Elections ("Board of Elections"), consisting of two Democrats and two Republicans, met with all the parties. After the Board checked all the machines and reviewed all suspect ballots, they made a unanimous decision not to change any of the decisions previously made. The recount conducted November 26, 1991, confirmed that Ryan had received the second highest number of total votes. Machine totals gave Ryan, a Democrat, 2,932 votes and Siegel, a Republican, 2,908 votes. The recount was not completed in the presence of either attorney or completed on the day that the Court had ordered at the time the parties appeared. The Board could neither determine an accurate count nor account for the security of the absentee ballots until "after the thorough search" after all had departed. Thereafter, the Board certified 61 absentee ballots for Siegel and 41 absentee ballots for Ryan. These figures were combined for certified totals of 2,973 votes for Ryan and 2,969 votes for Siegel.

The only seat in contest is between Siegel and Ryan.

On December 13, 1991, Siegel filed a verified petition and obtained an order to show cause to challenge the election results, pursuant to *N.J.S.A.* 19:29–1. He alleged that many voting machines malfunctioned; absentee ballots were improperly rejected; an absentee ballot of a person who died before the election was counted; an emergency ballot was not counted because it never reached the Board of Elections; a voter who arrived at the polling place before 8:00 p.m. was denied the right to vote because the voting machine was closed down and locked and a non-resident voted illegally.

## ISSUES

1. Where there has been no fraud or "malconduct" in an election but numerous improper rejections of legal votes by

election officials through no fault of any candidate, may the Court nevertheless void the election?

2. Did the malfunctions of the voting machines cause some votes not to be counted?

The court holds that to uphold the election would improperly disenfranchise voters and frustrate the will of the people and it would be unjust to the petitioner who received more legal votes than the respondent.

## I.

THE COURT IS VESTED WITH CERTAIN INHERENT POWERS BEYOND THOSE CONFERRED UPON IT BY *N.J.S.A.* 19:29–1 *ET SEQ.* AND IT CAN SET ASIDE ANY ACTION TAKEN WHICH IS ILLEGAL OR INEQUITABLE IN ORDER TO CARRY OUT THE WILL AND MANDATE OF THE PEOPLE.

The right to vote in a democracy is among the most precious of all individuals' rights. It is a mechanism which individuals can and do use to hold government accountable, even when other parts of the political process fail to produce accountability. For one's vote, when cast, to be translated into a true message to government and candidates, that vote must be accurately counted, and, if necessary, recounted at every stage of the election process. That voter's exercise of the franchise must not be diluted by another's fraudulent or illegal vote. The moment an individual's vote becomes subject to an error in the vote tabulation process, the easier it is for one's vote to be diluted. (*See The Law of the Electoral Counts*, Burgess, John W., 1888, Political Science Quarterly 3:633–653).

Contested elections and recounts have been prevalent in the American political system ever since the founding of the Republic. New Jersey was the first state to report an election contest, *The State v. Justices, etc., of Middlesex*, 1 *N.J.L.* 244 (*Sup. Ct.* 1794), which was ultimately overturned by the Gover-

nor and Privy Council. At the presidential level, major disputes took place in 1801 and 1825, with the House of Representatives choosing the President each time.

The other major dispute over the presidency took place in 1877 between Samuel Tilden, a Democrat, and Rutherford B. Hayes, a Republican. In that case, a commission resolved the electoral votes being disputed, in each instance in favor of Hayes, with the result that Hayes was elected President by the bare majority of one electoral vote. (*See* "Contested Elections", *Encyclopedia of the Social Sciences*, ed., Edward R.A. Seligman, pp. 308–310, New York, Macmillan, 1931).

Courts have long had certain inherent and equitable powers beyond those conferred upon them by statutes. *Marbury v. Madison*, 5 *U.S.* (1 *Cranch* ) 137, 2 *L.Ed.* 60 (1803); *Stevenson v. Gilfert*, 13 *N.J.* 496, 100 *A.*2d 490 (1953); Jacobs and Schnitzer, *Report on the Proposed Revision of the New Jersey Election Law*, 5 University of Newark Law Review 183 (1940).

Like the federal developments, the history of New Jersey election matters reveals jurisdictional uncertainty in each New Jersey jurisprudence. This uncertainty was somewhat clarified by the statutory procedure which evolved to hear and resolve election contests. The compelling judicial restraint theory grew out of the uncertainty of the court's powers and the constitutional commitment to the doctrine of "separation of powers". Yet, the strengthening of the courts as an equal branch of government in our present constitution changed the older decisions. (*See History of Voting in N.J.* ... 1664–1991, Richard P. McCormick, Rutgers Univ. Press, 1953). *In re 1984 Maple Shade General Election*, 203 *N.J.Super.* 563, 497 *A.*2d 577 (Law Div.1985).

The influential writers after the Revolution, at the nation's birth, urged preservation of the doctrine of "separation of powers" and sought, in fact, to insulate the judiciary from political involvement. *See* Locke, *Second Treatise of Government*, Gough 3rd ed. 1965; Montesquieu, *The Spirit of the*

*Law,* (Nugent translation), 1949, pp. 141–143; and Madison, *The Federalist,* No. 47, Cooke ed. 1966.

In 1794, the inherent jurisdiction of the Court to review elections was challenged in *The State v. Justices, etc., of Middlesex, supra,* 1 *N.J.L.* at 251. The note entered upon the record, set forth at page 255 in the Chief Justice's handwriting, ended the right of inherent judicial review of elections:

> ... January 7, 1795, on error before governor and council, this judgment was reversed, 8 to 3. I have heard the ground of this reversal was that the Supreme Court had no jurisdiction. *Sed. quere.*

*See also State v. The Clerk of Passaic,* 25 *N.J.L.* 354, 355 (Sup.Ct.1856).

Thus, the uncertainty of the Court's role in election matters led to passage of an act in 1877 entitled "An Act to Regulate Elections". The Act itself contributed little to removing the question of jurisdiction and even less to removing the uncertainty therein. *See Conger v. Convery,* 52 *N.J.L.* 417, 439, 445, 20 *A.* 166 (Sup.Ct.1890), *aff'd,* 53 *N.J.L.* 658, 663, 24 *A.* 1002 (E. & A.1891).

The Legislature in 1890 adopted the "Ballot Reform Act," which provided for the nullifying of an election and the ordering of a new one by a "justice of the Supreme Court ...". However, the statute was imperfect, incomplete and had a very doubtful effect as recognized by our courts. *See Roberts v. Shafer,* 63 *N.J.L.* 182, 42 *A.* 770 (Sup.Ct.1899), where the Court did define what they believed to be the role of a judge sitting as a legislative agent in an election contest (the present *N.J.S.A.* 19:29–1 *et seq.*):

> By the statute sub judice, the Justice sits as a commissioner and not in curia. *Id.* at 184 [42 *A.* 770].

Thus, the courts changed from an activist position to that of a mere legislative agent in hearing election contests.

This was confirmed by Chief Justice Beasley in the case of *In re Margarum,* 55 *N.J.L.* 12, 14, 25 *A.* 702 (Sup.Ct.1892), where he stated the "legislative view".

Therefore, aside from the general revision under the *Laws of 1930*, c. 187, Section 355, p. 829 (*N.J.S.A.* 19:29–1 *et seq.*), although the statutory scheme concerning the review of contests of nominations or elections by the judiciary has basically remained the same, the review has been expanded both by case law and the resultant ascendancy of the judicial branch as an equal power in government. Further, the present provisions of *N.J.S.A.* 19:29–5 implore the proceedings to be similar to a civil case, such that court rules apply. In addition, other statutes are now read into the election proceedings. *See Iannone v. McHale*, 236 *N.J.Super.* 227, 565 *A.*2d 422 (Law Div.1989) *rev.*, 245 *N.J.Super.* 17, 583 *A.*2d 770 (App.Div.1990) (the frivolous litigation statute, *N.J.S.A.* 2A:15–59.1, allowed the award of counsel fees.)

This historical "uncertainty" of the court's role in *The State v. Justices, etc., of Middlesex, supra,* is the origin of the "judicial reluctance theory" in election matters. Whatever its source, the judicial hesitation seemed to have had little legal or philosophical support and has been abandoned now in current practice.

Courts have long struggled with their proper role in review of contested elections. The New Jersey Constitution designates three distinct branches of government, and provides that:

"[n]o person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution." [*N.J. Const.* (1947), Art. III, ¶ 1.]

New Jersey courts have followed the provisions for review of elections as set forth by the New Jersey legislature in *N.J.S.A.* 19:29–1, but they have construed such powers of review to be "strictly statutory" and have determined that this section should be "rigidly" followed. *Burkett v. Francesconi*, 127 *N.J.L.* 541, 23 *A.*2d 780 (Sup.Ct.1942); *see also Clee v. Moore*, 119 *N.J.L.* 215, 195 *A.* 530 (Sup.Ct.1937).

The question as to whether a judge in an election contest sits as a legislative agent or with the full powers of the judiciary was not the subject of any judicial analysis from the adoption of

our present Constitution in 1947 until 1985. In a thorough and skillful analysis, Judge Haines distinguished between a judge's role as a legislative agent and a judge acting judicially. *See In re 1984 Maple Shade General Election, supra,* where Judge Haines stated:

> The Legislature exercises paramount control over election matters and the courts are bound by its enactments. Justice Handler, in his concurrence/dissent in *Gormley v. Lan,* 88 *N.J.* 26 [438 *A.2d* 519] (1981), stated it as follows:
>
> > The greater the statutory and administrative responsibility that is vested in the executive or legislative agents over election matters, the more constricted is the jurisdiction of the courts. Judicial and executive responsibilities in election matters stand, as it were, in inverse proportion to one another. (*Id.* at 46 [438 *A.2d* 519]).
>
> The present quest does not ignore that principle. It seeks only to fix the role of the court when it addresses election problems requiring judicial solutions, *i.e.,* problems which have not been considered by the Legislature. It acknowledges the fact that some problems must be resolved by judges who sit, not as judges, but as agents of the Legislature because the Legislature has said so.
>
> The difference between election recounts and election contests illustrates the difference between judges who are agents and judges who are judges. Recounts are covered by *N.J.S.A.* 19:28–1 *et seq.* contests by *N.J.S.A.* 19:29–1 *et seq.* Recounts involve judges only ministerially, as the officials who order recounts to be made. Only elementary decisions are required; the actual recounts are conducted by election officials. As a consequence the courts have referred to the judges who issue recount orders as legislative agents. *In re Election in Bethlehem Tp,* 74 *N.J.Super.* 448, 459–460 [181 *A.2d* 523] (App.Div. 1962); *In re Recheck of Machines in Jersey City,* 19 *N.J.Super.* 187, 189–190 [88 *A.2d* 227] (App.Div.1952). ("It is clear that the statutory jurisdiction conferred upon the judges of the Law Division of the Superior Court by *R.S.* 19:28–1, *et seq.,* is conferred upon them as individual judges thereof and is not conferred upon the court as such, and that the individual judge who acts in exercising such jurisdiction acts solely in the capacity of a legislative agent exercising a delegated authority.") *See also* the dicta in *Massett Bldg. Co. v. Bennett,* 4 *N.J.* 53, 60 [71 *A.2d* 327] (1950) and *In re Recheck of Ballots in South River, supra,* 27 *N.J.Super.* [109] at 111 [98 *A.2d* 900 (1953)]. Election contests involve much more than ministerial actions of judges and invite the conclusion reached here that they are subject to the exercise of judicial power. (*Maple Shade, supra,* 203 *N.J.Super.* at 576–577 [497 *A.2d* 577]).

In an election contest, the judge is a judge, hearing the matter with full authority in deciding the facts, the law and structuring a remedy. Without that conclusion, we would be left without a forum or remedy. *Id.* at 584, 497 *A.2d* 577.

The Board of Elections, both in its election day functioning and in conducting a recount, does not conduct an adversarial proceeding wherein a record is made that can be reviewed. On election day no determination was made on some ballots, no writings or any minutes or records were kept indicating the reasons for receiving or rejecting absentee ballots, and no record is available to review. Two commissioners testified that they could not remember the actual reason why certain absentee ballots were accepted and why others were rejected.

Although requested by petitioner at the recount, no Board member at any time expressed a desire to vote individually on each of the ballots that were before them. The sole question asked of them was "does any one want to change their opinions from the day of the election?" The commissioners having answered in the negative, no reason for the acceptance or rejection of any absentee ballot was ever established.

On the day of the recount the Board of Elections could not conclude and complete the recount since they could not locate an equal number of envelope flaps to match the number of absentee ballots. In a subsequent search, they found an additional absentee ballot which was eventually included in the total. All absentee ballot envelope flap certificates were then located, which finally equalled the total number of ballots.

Many of the actions and activities taken by the Board were outside the presence of the parties and their counsel, and there is no record from which this Court could conduct a review.

*N.J.S.A.* 19:29–1 states that an "... election.... may be contested ..." The statute does not state that the election can be reviewed or that the actions can be reviewed. It sets forth an adversarial proceeding of a contest, a hearing and trial between the contestant and incumbent. The Board of Elections is not even a party. See *Darling v. Murphy,* 71 *N.J.L.* 524, 59 *A.* 225 (Sup.Ct.1904). It is important to contrast this statute with *N.J.S.A.* 19:29–11 which provides:

The party against whom judgment is rendered may have it *reviewed* by the Appellate Division of the Superior Court on an appeal in lieu of prerogative writ. (Emphasis added).

*N.J.S.A.* 19:16–3 bespeaks of concurrent jurisdiction when it states the "... county board, judge of the Superior Court or other judge or officer conducting a recount thereof ..." *N.J.S.A.* 19:16–4 provides that "... unless the district board canvassing such ballots or the county board, *judge of the Superior Court or other judge or officer* conducting the recount thereof ..." This suggests that the Court has its own right to make determinations thereon.

## II.

### PETITIONER MUST ESTABLISH HIS ALLEGATIONS BY THE PREPONDERANCE OF THE EVIDENCE.

█ The standard of proof, or quantum of proof, that the petitioner must satisfy herein is that of the preponderance of the evidence. *See Evid.R.* 1(4), Comment 5; *McCormick, Evidence* (1954), § 320, p. 679. *N.J.S.A.* 19:29–5 provides for procedures at trial to be similar to those in a civil action "so far as practicable" but does not state any specific evidentiary standard.

The standard of proof in an election case was first set forth in *Brueckmann v. Frignoca*, 9 *N.J.Misc.* 128, 152 *A.* 780 (Passaic Cty.Cir.Ct.1931), where an election challenge was brought against various voters (inmates in a sanitorium) who voted, alleging they were not residents. The court found that to overcome the presumption of the continuance of prior domicile the petitioner had to establish his proofs by a preponderance. *Id.* at 132, 152 *A.* 780.

Judge Haines in the matter of *In re Evans*, 227 *N.J.Super.* 339, 547 *A.*2d 344 (Law Div.1988), considered the standard of proof in an election case under *N.J.S.A.* 19:29–1 *et seq.* There the petitioner, in addition to challenging voters, votes cast and election results, sought to remove the successful candidate

from office by claiming he was no longer a resident of the municipality, thereby actually challenging the qualifications of the incumbent office holder and successful candidate of the election to office. Judge Haines, after analyzing the cases, found that since the relief sought was not merely the contest of an election, but removal of a person from office based on qualifications, he set a higher standard of proof. Judge Haines stated:

> The preponderance rule is applicable in the normal civil case. *Evid.R.* 1(4), Comment 5. Only two New Jersey courts have addressed the question in an election case. In *Lepre v. Caputo,* 131 *N.J.Super.* 118 [328 *A.*2d 650] (Law Div.1974), the court held that the right to amend a nominating petition had to be proved by clear and convincing evidence. The court's concern was fraud, *e.g.,* that a candidate might procure signatures on a petition nominating him for one office and then, through an amendment procedure, change the petition to refer to another office. In *Michaud v. Yeomans,* 115 *N.J.Super.* 200 [278 *A.*2d 537] (Law Div.1971), the court established a presumption that a university student was not domiciled at the university and required him to rebut that presumption by only a preponderance of the evidence.
>
> The many cases dealing with standards of proof shed little light on the immediate problem. It is apparent, however, that the standard to be applied becomes more difficult as the significance of the issue increases. A criminal charge, for example, must be proved by the State beyond a reasonable doubt. In *Michaud,* the issue involved a student who attempted to register for voting purposes and was refused. The issue, as here, was domicile. Arguably, it was an issue fraught with consequences as serious as those considered in *Lepre:* the easy registration of thousands of college students who could change the balance of power in a community. A false claim of domicile is as fundamentally fraudulent as a false representation in a nominating petition. Both invite criminal penalties. Evans faces those penalties in the present suit. The claims against him are serious, too serious to be proved by the lowest standard of evidence. Clear and convincing proof is required. The conclusions of *Michaud* are rejected. [*Id.* at 347–348, 547 *A.*2d 344.]

Judge Haines applied a higher standard because respondent faced criminal penalties if in fact he was not a resident. The interest to be protected here is that of the "public interest." The interest of the voters who are legally entitled to vote is not to have their votes diluted by illegal voters. As such, the preponderance of the evidence burden applies. Invoking a higher standard of proof obviously favors one side over the other, and clearly there are no sides here. Instead, the interest of the public is paramount and this interest is equally present in

both sides of the case. *See Herman v. United States,* —— *U.S.* ——, 111 *S.Ct.* 355, 112 *L.Ed.*2d 318 (1990); *In re Polk License Revocation,* 90 *N.J.* 550, 560–561, 449 *A.*2d 7 (1982). The parties are not the participants nor did they testify.

Judge Cammarata's approach in *Michaud v. Yeomans,* 115 *N.J.Super.* 200, 278 *A.*2d 537 (Law Div.1971) was indirectly ratified by the Supreme Court in *Worden v. Mercer Cty. Bd. of Elections,* 61 *N.J.* 325, 294 *A.*2d 928 (1972), when it indicated that "domicil" (the criterion underlying "residence" for voting purposes) "is not a unitary concept." *Id.* at 343, 294 *A.*2d 928. In adopting a more lenient standard for proof of election domicil than might apply elsewhere, the Court gave weight to the idea that voting rights are to be treated indulgently and are to be subjected to the minimal restraints necessary to prevent fraud. In *Worden,* college students were held capable of registering and voting from campus addresses despite having homes elsewhere.

The Deputy Attorney General suggests that one way to harmonize all the published opinions is to require proof of illegality by clear and convincing evidence, while applying only a preponderance burden to proof of legality. No court has done so in an election contest where there has been no wrong-doing by either candidate. There is no basis to raise the level of proof for one candidate against another candidate for wrong-ful or illegal acts of third persons.

Why afford an illegal voter greater rights and protections and require a higher standard of proof for a petitioner to nullify an illegal vote? Why grant an illegal voter greater protection than afforded a legal voter? It is obvious that an illegal voter, by voting wrongfully, dilutes the rights and votes of all legally qualified voters. Thus the illegal voter should be afforded no greater protection than a legal voter.

The standard to be utilized for the petitioner to establish his cause of action is preponderance of the evidence.

## III.

## "LEGAL VOTES" WERE REJECTED "SUFFICIENT TO CHANGE THE RESULT" ALONE OR WHEN ADDED TO OTHER IRREGULARITIES, REQUIRING SETTING ASIDE THE RESULTS.

*N.J.S.A.* 19:29-1(e) provides that an election may be contested:

When illegal votes have been received, or legal votes rejected at the polls sufficient to change the result;

This statute permits an election to be contested where illegal votes were cast or bona fide votes were rejected.

A. *Voter Rejected because the Polls Closed Early.*

■ The court is satisfied that three men entered the outside door of the polling place at Jefferson School before 8:00 p.m. before the door was closed by the janitor in the presence of Sgt. Robert Cimino, assigned by the Maplewood Township Police Department to the polling place, who radioed to the Police Department for a time check. They responded "20:00." Sgt. Cimino said the three entered "simultaneously with my time check" before the door was closed. From the door there is a hallway leading to the gymnasium where voters from three districts vote.

Several witnesses testified that the three men had entered the polling place at or about 8:00 p.m., but no one knew their names or whether they were eligible voters. Even after the testimony concluded, it was unknown who these three men were.

After the election the wife of Stephen Balls read in the local newspaper about this trial and the testimony of voters being rejected at the polls before 8:00 p.m. Since Balls had told his wife that he had been rejected, she told him about the newspaper story. He then contacted Siegel to tell him about the rejection. Upon petitioner's request, the court exercised its discretion to reopen the case to take Balls' testimony, which

corroborated and pieced together all the other testimony and was believable in all respects.

Maura Kelly was elected judge of the district board of elections by the other members pursuant to *N.J.S.A.* 19:6–10 [1], which placed her in charge of the polling place. She testified that the polling place opened at 7:00 a.m., based upon the clock upon the wall. Therefore, the polling place should have closed by that clock also. She testified that sometime before 7:55 p.m., and definitely before 8:00 p.m., a man she did not recognize came in and attempted to vote at her polling place. She was sure it was before 8:00 p.m. because, as she was removing the flag which was on the wall behind the table, she looked up at the clock on the wall when "the commotion" started.

Patrick Clark, district board member, testified that either Maura Kelly or Claudia Donnelly informed him that someone was present to vote and that someone did, in fact, present himself to the table. Maura Kelly testified she heard Clark tell the voter, "It's past eight o'clock; you can't vote." Kelly's testimony further indicated that it was not she who said it because she heard Clark respond as she was taking down the flag. Thus it is clear that the voter presented himself at the table to the other worker, Ms. Donnelly, and thereafter was told he could not vote.

Yet, Maura Kelly is certain that this occurred before 8:00 p.m. Clark says he thinks it was after 8:00 p.m., but he did not determine the time from the clock on the wall.

Clark pulled the plug on the machine, disconnected the light, returned to the machine and turned the key which locked the machine. He did not close the machine at the direction of the judge.

---

[1] Each election district has four district board members, *N.J.S.A.* 19:6–1, two republicans and two democrats (since they were the two political parties that cast the largest number of votes at the last preceding general election), *N.J.S.A.* 19:6–3, one of whom is designated as the judge.

Arnold Urken[2], a district board member, testified that the end of election "was not coordinated" and that they were "overwhelmed" at the close down.

After Clark and Urken had closed down the voting machine, they heard three people complaining about not being able to vote. Sgt. Cimino said that since the machines were closed, they could not vote. He said at the time the three were turned away it was at least 8:00 p.m., but that they could have been in the building before 8:00 p.m.

Once the plug for the voting machine was disconnected by turning the key at or before 8:00 p.m., the turning of the key prevented restarting the machine.

The rejection of Balls caused a commotion. Respondent's witness, Harvey Weissbard, said that a discussion occurred between a district board worker and a voter who was attempting to vote. He approached and said that the person should be allowed to vote. He said that the man was "probably in the room before 8:00 p.m., but I told the man to leave his name, but the man did not." He further stated that the police officer told the voter that the polling place was closed and he would have to leave. However, at that time voters were still voting at District 2 in the gymnasium.

*N.J.S.A.* 19:15–2 requires the polling places to open at 7:00 a.m. and to close at 8:00 p.m., but this statute is subject to *N.J.S.A.* 19:15–9 which provides:

After the hour fixed for closing the polls voters already within such place or room or in line shall be permitted to prepare and cast their ballots.

Whether Balls arrived at the table or voting machine before or after 8:00 p.m. is irrelevant because he was within the

---

[2]Ironically, Mr. Urken, a college professor of computer science and political science at Stevens Institute of Technology, was working at the polls to learn the election process. What he apparently did not know was that the polls cannot be closed down at 8:00 p.m. if there are any prospective voters "already within such place or room." *N.J.S.A.* 19:15–9.

polling place before 8:00 p.m. when the door was closed and therefore should have been permitted to vote.

What took place herein is that it is *illegal* to shut down the voting machines at 8:00 p.m. UNLESS AND UNTIL all voters in line and "already within such place or room", whether it be the entrance hall, lobby, hallway or room where the voting machines are located, are permitted to vote.

Balls testified that after he entered the hall to the gymnasium, two other people followed him "right at or just about 8:00 p.m. ... I believe it was before 8:00 p.m. The clock said a couple of minutes before 8:00. The person at the machine said 'the clock was wrong and my watch was correct'." When Balls presented himself to the first desk the workers pointed to another polling machine where he went, but it was closed down. He was told by Urken, "Once the machine is locked, there is nothing that I can do about it." As Sgt. Cimino was standing between the machines there was a discussion as to whether Balls was in before 8:00 p.m. When Sgt. Cimino told Balls that there was nothing he could do, Balls left without voting. Someone asked for his name, but he said he did not think it made any difference. He did not think anymore about his rejection until his wife read the newspaper.

It is uncontroverted by the judge, Maura Kelly, by district board member Urken and Stephen Balls, that Balls was in the polling place before 8:00 p.m., that the machine had been shut down by Clark before 8:00 p.m., and that Balls was told he could not vote at that time.

No member of the district board, including Clark, offered Balls an alternative method of voting, such as an emergency ballot. No member of the district board offered to call the Township Clerk or Board of Elections to determine if anything could be done. Despite the intercession of Weissbard to assist Balls, all they said was that he could not vote.

The Deputy Attorney General contends that Balls never went so far as to prove himself a "legal voter" by presenting himself

to the district board to sign the signature copy register, as required by *N.J.S.A.* 19:31A–8. It is undisputed that he was ready, willing, able and eligible to vote but was told emphatically by the district worker, "You can't vote." He was clearly frustrated and denied the right to vote. Since there was great confusion, he could not be expected to ask to sign the register book. The right to vote far outweighs technical niceties.

Signing the signature register would have been a futile act since there would have been no way for him to vote since the machine had been closed down. The district board members were derelict in their duties and responsibilities because they did not offer Balls an emergency ballot or even bother to identify Balls despite the fact that Weissbard insisted that they take his name.

This situation is not analogous to *In re Petition of Hartnett,* 163 *N.J.Super.* 257, 394 *A.*2d 871 (App.Div.1978), where a voter refused to go to the municipal building because a page listing her name in the permanent registration book was missing. Nor is it a situation where a voter refused to take direction from the district board as to what he would have to do to preserve his right to vote. Balls listened to the district board, which offered him no alternatives or options but simply told him "It's too late." The fact they could have offered him an emergency ballot, and did not do so, only heightens the effect of the early closing.

The mystery about the other two men who came in the door about the same time as Balls was solved when Balls said that they went to another district table in the same room and were allowed to vote at another machine.

Therefore, Balls was a legal voter rejected. However, the court does not know for whom he would have voted so his is an

open ballot [3].

B. *"Emergency" Ballot Not Counted.*

Tessie Ricca, a registered voter since 1960, went to vote at Seth Boyden School (District 11) with her daughter and son-in-law. Although they were permitted to vote, she was told, "You can't vote today because we don't have your name in the book." After the district workers were able to find her permanent registration page, Mrs. Ricca was told that the (signature) boxes on the page stopped with 1990 at the bottom, so she would have to go to Newark to get a new page. She never refused to go as the voter did in the case of *In re Petition of Hartnett, supra,* 163 *N.J.Super.* at 267, 394 *A.*2d 871.

Lucille Friedman, the judge of the 11th District, remembers that originally they could not find Mrs. Ricca's page in the permanent registration book. When they found the page, there was no line for the year 1991. Although Mrs. Friedman thought that Mrs. Ricca could use an emergency ballot, she was mistaken because the form states that an emergency ballot should be used only when the voting machine breaks down. However, Mrs. Friedman wanted to determine if Mrs. Ricca could use an emergency ballot so she called the Municipal Clerk's Office at the Township Hall. A woman there responded that Mrs. Ricca could use an emergency ballot.

The district board's request for Mrs. Ricca to go to Town Hall or Newark would have been proper only if the page could not be found, but the page was found. *N.J.S.A.* 19:31–21 provides:

In the event that the duplicate permanent registration form of any person *cannot be found in the signature copy register* at the time he applies for a ballot or voting authority, a member of the district board shall promptly ascertain from the commissioner or a duly authorized clerk if such person is permanently registered. Upon information that such is the fact, such member

---

[3]The term "open voter" is sometimes used under *N.J.S.A.* 19:23–45 to refer to a person who has not declared a political party affiliation and has never before voted in a primary election. Balls had never voted in a primary election.

of the district board shall require the person applying for a ballot or voting authority to obtain an order from the commissioner authorizing him to receive a ballot or voting authority. *The commissioner shall specially authorize and deputize clerks to issue such orders in municipalities within his county.* (Emphasis added).

The district board sought such guidance.

Mrs. Friedman then had Mrs. Ricca take and cast the emergency ballot and sign the envelope certification. Mrs. Ricca insisted that she be given some privacy, went to the end of the table, marked her ballot, put it into the envelope, sealed it, and gave it back to Mrs. Friedman.

Thereafter, all the district board members signed the envelope and Mrs. Friedman wrote in the front of the signature registration book ("A–K") a notation about the use of the emergency ballot. At the end of the evening the district board opened the envelope, reviewed the ballot and on the canvass and tally sheet wrote at the lower left hand corner "1 emergency ballot used," added a "plus 1" to the total number of voters who voted, and added "plus 1" to each of the candidates for whom Mrs. Ricca cast a vote, "including 1 additional vote for Noel Siegel." She testified that she then placed the ballot back in the envelope, which they all signed, took the envelope, including the computer print out of all machine votes with the used and unused emergency ballots to Elizabeth Fritzen, the Maplewood Township Clerk, between 8:30 p.m. and 9:00 p.m. on November 5. Although Mrs. Friedman mentioned to the person at the desk in the Clerk's Office that there was one used emergency ballot in the envelope, Ms. Fritzen never bothered to count the emergency ballots used and therefore did not know how many, if any, there were. Mrs. Friedman indicated that there was confusion at the Township Hall. Ms. Fritzen mistakenly had two Township employees take everything to the Board of Elections in Newark that night. She then picked up the envelope on December 5.

Joseph Fernicola, the Chief Clerk of the Superintendent's Office, testified that upon his examination of the "A–K Book",

he could not find the notation or sheet referred to and submitted DS–1 which indicates that in fact no notations had been made. However, he later testified that after a full search of the office had been conducted and the "A–K Book" was accessed, the sheet was produced, which shows a hand-written notation wherein Lucille Friedman wrote:

"Tessie Ricca
24 Taranto Court
No line in Book for 1991
Needs new page"

There is no question in the mind of the district board members that Mrs. Ricca did appear, was identified, was qualified to vote, and they received Mrs. Ricca's ballot. They properly canvassed it and added it to the canvass and tally sheet as would have been done when any emergency ballot was used during the election.

The fact that the ballot cannot now be located is immaterial since the district board had the ballot, canvassed the ballot, added that ballot result to the canvass sheet on election night, indicated the use of the emergency ballot thereon at the lower left hand corner, and indicated the reason for Tessie Ricca's use of the emergency ballot in the handwritten notation on the sheet in the Superintendent's book.

Respondent Ryan relies upon *In re Hartnett, supra,* where Judge Larner analyzed various election problems and their effect on the election. One problem dealt with a voter whose signature copy register page was missing from the registration book, which is not the case with Mrs. Ricca. Judge Larner found that the voter was not a legal voter rejected pursuant to the statute since the voter failed to take further procedural steps to protect that right to vote. *Id.* 163 *N.J.Super.* at 268, 394 *A.*2d 871. Here, Mrs. Ricca did just what the district board told her to do after the district board called Town Hall and received instructions to use an emergency ballot.

The problem arose when the County Clerk refused to add in the handwritten tally notes of the district board counting the

emergency ballot. Mrs. Patricia McGarry Drake, the Essex County Clerk, testified that this vote was rejected because there was no proof that there was an emergency ballot used.

Since the district board members and the Township Clerk's office authorized the use of an emergency ballot for Mrs. Ricca, her ballot was properly cast, canvassed, tallied and brought to the Township Clerk. Mrs. Ricca did everything the district board asked her to do.

Voters should not have to jump hurdles to vote. It was not Ricca's fault that she did not sign either the signature copy register (*N.J.S.A.* 19:31A–8) or the voting authority (*N.J.S.A.* 19:52–2.1) and no ballot representing her votes was ever found. A vote cast should be counted in the absence of fraud or misconduct. Since errors were made by election officials on three levels: the Superintendent of Elections in not having a page for 1991 for Mrs. Ricca's signature in the permanent registration book, the district board members in permitting the use of an emergency ballot and the Township Clerk in authorizing an emergency ballot and in handling the ballot, Mrs. Ricca's vote for Siegel should not be disenfranchised.

IV.

## ABSENTEE BALLOTS WERE WRONGFULLY REJECTED BY THE BOARD OF ELECTIONS.

### A. *Blue Pen Used to Complete Ballot with Notation thereon Made on the Ballot.*

■ The Board of Elections wrongfully rejected an absentee ballot which they declared to be "identified" and having "distinguishing marks" in violation of *N.J.S.A.* 19:16–4:

> No ballot which shall have, either on its face or back, any mark, sign, erasure, designation or device whatsoever, other than is permitted by this Title, by which such ballot can be distinguished from another ballot, shall be declared null and void, unless the district board canvassing such ballots, or the county board, judge of the Superior Court or other judge or officer conducting the recount

thereof, shall be satisfied that the placing of the mark, sign, erasure, designation or device upon the ballot was intended to identify or distinguish the ballot. No ballot shall be declared invalid by reason of the fact that the mark made with ink or the mark made with lead pencil appears other than black.

David Sprague applied in person for an absentee ballot at the Office of the County Clerk. After he handed his application to an employee of the County Clerk and having the application approved, said employee gave him an absentee ballot, the inner envelope and flap and the outer envelope to cast his ballot.

*N.J.S.A.* 19:15–27 provides that an absentee ballot must be voted "... in black ink or black lead pencil ..." As is usually the rule rather than the exception in the election law, the provisions of *N.J.S.A.* 19:16–4 obviate that direction by stating:

No ballot shall be declared invalid by reasons of fact that the mark made with ink or the mark made with lead pencil appears other than black.

Despite that amelioration of the "Black Letter Rule," nowhere is that fact disclosed to the voter. To the contrary, at the top of the ballot it states "Instruction to Voter" and No. 2 states:

To mark a cross, plus or check or when writing a name on this ballot *use only black ink or black lead pencil.* (Emphasis added).

Sprague testified that he did not have any instrument to mark his ballot, asked an employee of the County Clerk for an instrument and was handed a "blue ink ballpoint pen" to complete the ballot. As he began to fill out the ballot he noted the instructions which were printed on the ballot prohibited the use of such a pen. He testified that he went back to the employee, raised the question of the blue pen and was told that he could use the blue pen regardless of the instructions. Despite the approbation of said employee that a violation of the instructions would be proper, Sprague, being a retired engineer, was skeptical. He testified that he wrote on the bottom of his ballot:

(Please note that the ballpoint pen used was given me by the County Clerk's Office, RM 245, H.O.R.)

Mr. Sprague testified that he did this because "I wanted my ballot to be valid."

Laurie Clark, chairperson of the Board of Elections, did not remember this ballot from the election but only remembered seeing it at the recount. She testified that although there was no decision as to what the intent of this voter was, there was no writing or memorandum or decision by the Board when it opened the inner envelope or at the recount indicating the reason for its rejection.

An examination of the ballot does not show or indicate anywhere thereon that any Board member placed his or her initials disqualifying the ballot as had been done in other instances, such as Dr. Crandall's.

Linda von Nessi, Assistant Chief Clerk of the Board of Elections, said that when an absentee ballot is rejected, normally the reason is written on the ballot or some other place, but this was not done with this ballot. She said that at the recount the Board of Canvassers reviewed it and rejected it again because of the markings on the ballot, notwithstanding the fact that they could not identify who the voter was.

Laurie Clark, who reviewed all the absentee ballots, remembers that at the recount one ballot (later determined to be Sprague's) had previously been rejected because it had a "distinguishing mark outside the area or within the ballot." She testified, however, that blue ink had nothing to do with the rejection. Although the Board took no formal vote, she said no Board member opposed the rejection.

Patricia Sebold, a Democrat and a Commissioner of the Board of Elections, recalls the "blue pen" ballot because she said the Board, when examining the ballot, was "laughing" because it had so much writing on it. She said her rejection of the ballot was not because it contained distinguishing marks placed there by the voter to identify it, but that the voter's initials appeared thereon as "H.O.R." Despite the fact she was asked what building she was presently in, what building her office was in, and what the commonly accepted abbreviation through all the Courthouse is for that building, she had never heard of "Room

245 of the County Clerk" located in the Hall of Records (RM 245, H.O.R.) or the Hall of Records being abbreviated as "H.O.R."

Our courts and our Legislature do not make every mark upon a ballot, even if it is a distinguishing one, grounds for disqualification.

Obviously a ballot which contains only write-in votes is a distinguishable ballot. Obviously any ballot that is cast for a split ticket, both Republican and Democratic, is a distinguishable ballot. Any ballot that contains a bullet vote or single vote for a particular class of candidates is a distinguishable ballot. If there is only one voter in the entire election who applies for an absentee ballot or if only one voter in the entire district applies for an absentee ballot, it would be readily apparent who that voter is.

The statute regarding disqualification bespeaks to (1) marks placed upon the ballot (2) which distinguished it and (3) were intended by the voter to identify or distinguish it.

Sprague's ballot does not identify the voter or violate its secrecy. The ballot envelope does not contain any distinguishing marks which are apparent on the outside of the inner envelope which could have led anyone to know what was contained therein. The ballot contains nothing on its face to indicate anything other than the voter was concerned that he was being told to vote his ballot with a pen supplied by a county worker and in a color of ink different than that permitted by the instructions ("Black Letter Rule").

The irony is the misleading instructions printed on the ballot, which the law negates since blue ink is allowed by the statute. However, this was unknown to the voter. Sprague was concerned, and he wanted to ensure that his ballot "was valid." His intent is clearly indicated on the ballot. The markings by the voter were not made with the intent to distinguish the ballot.

As far as the propriety of markings is concerned, the courts have adopted a relatively lenient standard. *In re Keogh–Dwyer*, 85 *N.J.Super.* 188, 204 *A.*2d 351 (App.Div.1964), rev'd, in part, 45 *N.J.* 117, 211 *A.*2d 778 (1965).

The Appellate Division stated:

> Not every mark on a ballot makes the same null and void. It is only a mark that was placed thereon by the voter with the intention to identify or distinguish the ballot that so voids the same. *Goddard v. Kelly*, 27 *N.J.Super.* 517 [99 *A.*2d 667] (App.Div.1953) and *Petition of Wade*, 39 *N.J.Super.* 520 [121 *A.*2d 552] (App.Div.1956). [*Id.* at 193, 204 *A.*2d 351].

In the matter of *In re Sadlon*, 88 *N.J.Super.* 37, 210 *A.*2d 630 (App.Div.1965), the Appellate Division stated:

> Under *N.J.S.A.* 19:16-4 the determination of whether a mark, sign, erasure, designation or device upon a ballot was intended to identify or distinguish that ballot is left to the judge conducting the recount. Due regard must be given to the county judge's exercise of his function as a fact-finder. [*Id.* at 40, 210 *A.*2d 630].

Furthermore, *N.J.S.A.* 19:16-3 and 19:16-4 require the Board of Elections to determine that an identifying or distinguishing mark was placed on the ballot with intent to identify or distinguish it before such ballot can be rejected. There is testimony about the rejection, but the Board of Elections has no records to indicate how they considered this ballot. There are no markings on the ballot to show that the Board in fact rejected it, the reason for its rejection or that they made the determination pursuant to *N.J.S.A.* 19:16-4. Despite the statement of respondent Ryan's attorney to the contrary, this ballot was challenged at the recount.

It is true, as the Deputy Attorney General urges, that the proofs that this Court should consider go the votes and not, necessarily, to the way they were handled.

Respondent Ryan's attorney asserts that these markings made the vote identifiable and thus constitute a distinguishing mark. What makes the voter identifiable (as has been placed in the record by petitioner) is that the Board of Elections, without knowledge that it is doing so, places on the bottom of the ballot the name of the town and the voting district for which the

absentee ballot is being issued and in which the absentee voter resides.

Thus, of all the absentee votes cast in the election, it was readily apparent to petitioner that the "blue ballot" was cast by someone who resided within 7th District. It was easy to identify those voters who came to the Courthouse and applied for an absentee ballot directly and were from the 7th District since there would be no postmark on the absentee application. An examination of the records of the absentee voters discloses that of the persons from the 7th District who applied for an absentee ballot in person, only three possible voters could be the one in question.

Despite the Deputy Attorney General's assertion that in an election contest the court reviews the record below, this is a contest requiring a full hearing and not a limited review. This becomes obvious where the Board took no action below with regard to this ballot, conducted no hearing, made no notes, kept no records, and in fact did not even sign the absentee ballot or state the reason for their rejection. This court lacks a record to review. As noted in *Sadlon, supra,* it is the Superior Court judge's fact finding that applies here. *Id.* at 40, 210 *A.*2d 630.

In determining the scope of review of the Board's decision, one must contrast the language of *N.J.S.A.* 19:16–3 and 4 referring to recounts under *N.J.S.A.* 19:28–1 *et seq.,* with *N.J.S.A.* 19:29–1 governing contests. In the former instance, the Legislature refers to the district board, county board, judge or other officer conducting a recount. The court's review of a ballot is plenary and *de novo* in such case, but no mention is made of contests. Under the latter chapter, the court must determine whether a legal vote has been rejected.

The question of whether a court sits *"in curia"* or is merely a legislative agent has been debated at length. *See, e.g. In re 1984 Maple Shade General Election, supra; In re Evans, supra.* In a contest, the judge performs a judicial function to determine whether the statutory cause of action has been

established, rather than mechanically following the statutory dictates which apply to a recount.

The court finds that the Board failed to make the necessary finding regarding the voter's intent to identify or distinguish the "blue pen" ballot nor could it have reasonably done so.

Clearly, the statement written by the voter was not done with "... the intention to identify or distinguish the ballot ..." but to explain why an ink color other than that specified in the instructions was being used. Therefore, Sprague's absentee ballot for Siegel was improperly rejected.

### B. *Ballot Not in Inner Envelope.*

*N.J.S.A.* 19:57–31 provides:

On the day of each election each county board of elections shall open in the presence of the commissioner of registration or his assistant or assistants *the inner envelopes* in which the absentee ballots, returned to it, to be voted in such election, are contained, *except those containing the ballots which the board or the County Court of the county has rejected,* and shall remove from said inner envelopes the absentee ballots and shall then proceed to count and canvass the votes cast on such absentee ballots ... [Emphasis added].

Edward T. Mollach, Jr. applied for an absentee ballot, which the County Clerk approved. When the Board of Elections received his absentee ballot, they observed that the ballot was not sealed in the inner envelope. Therefore, they put the ballot back in the outer envelope and stapled the envelope. Although the ballot complies in all respects with the election statutes except that it was not sealed in the inner envelope, the Board rejected it for that reason.

There is no legal basis for the Deputy Attorney General's contention that although this was a legal vote which was rejected, since there was no "malconduct" as defined in *Matter of Mallon,* 232 *N.J.Super.* 249, 272, 556 *A.*2d 1271 (App.Div. 1989), certif. den., 117 *N.J.* 166, 564 *A.*2d 883 (1989), the rejection should not be disturbed.

This ballot must be counted for the reasons set forth in *Application of Langbaum,* 201 *N.J.Super.* 484, 493 *A.*2d 580 (App.Div.1985), where Judge Bilder stated that voters need not

seal the ballot in the inner envelope and in so doing merely waived the right to secrecy, but the ballot must be counted. *Id.* at 488–490, 493 *A.2d* 580.

The court, over objection by respondents' attorneys, unstapled the outer envelope and removed the ballot which revealed that Mollach had voted for Siegel and Grasmere. The court did so because Mollach, by not placing his ballot in the inner envelope, had waived his right to secrecy. *Id.* at 490, 493 *A.*2d 580. In any event Mollach in writing waived any right to secrecy and "authorized the Court to open the ballot and place it into the record."

C. *Failure of the County Clerk and Board of Elections to Compare Signatures with the Voter's Permanent Registration Signature.*

■ Elizabeth Jones Crandall, M.D., a registered voter since the 1940's, planned to be in California on November 5, 1991, so she had her husband request absentee ballots for both of them. He signed her name for her under the certification on the civilian absentee ballot application, requesting the clerk to send it to her at 1011 Oliver Avenue, San Diego, California. After she received the absentee ballot she marked and sealed it, signed the flap certification on the flap, placed the ballot in the inner envelope, put the inner envelope in the "Official Civilian Absentee Ballot" envelope and wrote her name and return address on the envelope.

The County Clerk is required to verify that the signature contained on the absentee ballot application matches the signature of the voter contained in the permanent registration books. *N.J.S.A.* 19:57–10.

There are no markings anywhere to indicate whether a comparison was done, approved or disapproved. If the signatures did not match, the County Clerk was obligated to notify the voter stating the reason for the disqualification of the ballot application. *See N.J.S.A.* 19:57–10:

... If after such examination the county clerk determines that the applicant is not entitled to a ballot, he shall mark on the application *"Disapproved"* and shall so notify the applicant, stating the reason therefor. (Emphasis added).

If the comparison was not done, the voter should have had the right to rely upon the action or inaction of the County Clerk in assuming that the ballot application was approved.

If Dr. Crandall's absentee ballot application had been rejected when the County Clerk received it on October 4, she could have secured another absentee ballot application and reapplied.

The voter should not be caused to suffer for the failure of the Clerk to perform a duty to verify the signature and if there is a problem with the application, to notify the voter. Likewise, had the Clerk performed the function and disapproved the ballot application, the voter would have known so and could have made alternative arrangements within 30 days by reapplying or by going directly to the polls to vote.

Ms. von Nessi, the Clerk of the Board, testified that the Board's staff determined that the ballot should be rejected since the signature on the inner envelope flap did not match the signature on the application and brought this discrepancy to the attention of the Board. No one, neither Ms. von Nessi nor any employee or member of the Board, performed the comparison of that signature to the permanent registration books. *N.J.S.A.* 19:57–24 provides:

The county board of elections shall, promptly after receiving each civilian absentee ballot, remove the inner envelope, containing the ballot, from the outer envelope and shall compare the signature and the information contained on the flap of the inner envelope with the signature and the information contained in the respective requests for civilian absentee ballots. * * * *The county board shall reject any such ballot unless the board is satisfied as a result of such comparison or by reference to the permanent registration books that the voter is legally entitled to vote and that the ballot conforms with the requirements of this act.* (Emphasis added).

If, after the Board compares the signatures on the inner envelope flap to the application they do not match, the Board can only reject a ballot after they, in fact, make a comparison to the permanent registration books. This is done only if the signatures on the inner envelope flap and the absentee ballot

application do not match. No comparison was done in this instance. Instead, we have a voter who has applied for an absentee ballot, has not had the ballot application disapproved or rejected by the Clerk and assumes, and should be able to rely upon, her right to vote by absentee ballot. Dr. Crandall could not have voted in person at this election because of the County Clerk's action or inaction and the notation made in her permanent registration signature book. Once the absentee ballot application is approved and the ballot is mailed by the Clerk, the voter cannot then vote in person at the polling place. *N.J.S.A.* 19:57–28. The voter is locked into the absentee ballot procedure.

Notwithstanding the Board has an independent obligation to review each ballot no matter what the Clerk did or failed to do, no member of the Board or employee made the requisite signature comparison to the permanent registration books but merely rejected the ballot without going further. A proper review would be not to assume that the County Clerk (1) compared the signatures, (2) properly compared the signatures and (3) properly determined eligibility. The Board, unaware that a signature comparison was not made between the inner envelope flap and the permanent registration books, rejected the ballot for a "sig." Had the Board performed their tasks, duties and responsibilities, they would easily have determined, as the testimony evidenced, that the signature on the inner envelope flap was the voter's.

The County Clerk failed in the first instance to compare the signatures and notify the voter of disapproval; the Board of Elections compared the signatures only between the inner envelope flap and the application and, after finding a discrepancy, failed to compare the inner envelope flap with the permanent registration books. Meanwhile, the legally qualified voter for 30 days believed that she had been approved for an absentee ballot, had properly cast an absentee ballot and would have her absentee ballot counted in the election.

The Deputy Attorney General asserts that case law does not require judicial review, citing *Matarese v. Superintendent of Elections,* 228 *N.J.Super.* 148, 549 *A.*2d 69 (Law Div.1988). In that case, the Board of Elections, in reviewing an absentee ballot, found that no reason had been checked on the absentee ballot application for issuance of the ballot, even though the County Clerk had approved the application. That matter was presented by the Board of Elections to a judge of the Superior Court for his determination. Judge Haines voted to count the ballot when the matter was presented under the provisions of *N.J.S.A.* 19:57–24, but later he overruled his prior decision and held that the ballot should have been rejected.

Despite the novelty of Judge Haines' first counting and then discounting the ballot, what is clear is that the matter *can* be presented to a judge of the Superior Court for resolution. Had that been done herein, the arbitrary actions of the Clerk, the Board of Elections' employees and the Board of Elections would have been obviated.

The voter should not be penalized for the failure of the County Clerk to check the signature, reject the application and notify the voter; or the failure of the Board to compare the inner envelope flap to the permanent registration. As the Honorable Arthur T. Vanderbilt said in *The Challenge of Law Reform* (1955), quoting E. Wilkerson, M.P., in *Committee on Members' Powers Report* at 138 (1936):

[N]othing is as dangerous in a democracy as a safeguard which appears to be adequate but is really a facade.

Failure to sign the required application form is a "mere irregularity" which did not void her vote. *Wene v. Meyner,* 13 *N.J.* 185, 196, 98 *A.*2d 573 (1953). *Friends of Jim Usry v. Matthews,* 187 *N.J.Super.* 176, 180, 453 *A.*2d 1360 (App.Div. 1982).

To disenfranchise Dr. Crandall's vote and frustrate the free expression of her will as to the election would serve no legislative purpose. *Id.* at 181, 453 *A.*2d 1360. The purpose of the

statutory provision requiring the voter to sign the application form, *N.J.S.A.* 19:57–4, is primarily to eliminate fraudulent voting. The irregularity does not go to the essence or substance of the right to vote where there is no malconduct or fraud. *Id.* at 182, 453 *A.*2d 1360.

Provisions in the absentee voting law were adopted to preserve the sanctity and proper functioning of elections. The judicially perceived legislative intent reflects the "desire to preserve enfranchisement of qualified voters, safeguard the secrecy of the ballot, deter fraud, and achieve prompt determination of the election." *In re Matter of Petition of Byron*, 165 *N.J.Super.* 468, 473–474, 398 *A.*2d 599 (Law Div.1978), aff'd, 170 *N.J.Super.* 410, 406 *A.*2d 982 (App.Div.1979), certif. den., 82 *N.J.* 280, 412 *A.*2d 786 (1979).

Voiding Dr. Crandall's ballot because her husband signed her application for the ballot, and thus disenfranchising her, is too harsh a remedy where the deficiency does not affect the integrity of the electoral process. *Application of Langbaum, supra,* 201 *N.J.Super.* at 490, 493 *A.*2d 580.

Although the very "absentee" nature of the absentee voting privilege warrants closer scrutiny than poll voting to ensure untainted elections, the Board of Elections should not shirk its duty to compare the signature on the flap certification of the absentee ballot with the signature of the voter in the permanent registration books before disallowing the vote. The Legislature in using the word "or" did not intend that before rejection, the voter's signature did not have to be compared with her signature on file with her permanent registration. The Legislature did not envision the scenario suggested by respondents, *i.e.*, had Dr. Crandall's husband also signed the flap certification of the absentee ballot (thereby conforming to the certification on the request for her absentee ballot), "her" vote would not have been rejected. It was the difference between the two "signatures" which caused her ballot to be

rejected. The Legislature never intended that two improper signatures could constitute one legal vote.

The Board's practice, as condoned and supported by the Deputy Attorney General, not to compare absentee voters' signatures with their permanent registration signatures is fraught with the opportunity for fraudulent voting and is violative of the rights of all lawful voters. It is true that Dr. Crandall should have signed her request for an absentee ballot, but the real cause of the rejection was the County Clerk's failure to compare signatures after receiving Dr. Crandall's request on October 4, 1991, and then the Board's failure to compare the ballot flap certification with the voter's permanent registration signature.

The right to vote in person or the privilege to vote by absentee ballot is highly valued and should not be rejected except after thorough review and, then, only for just cause. This may even require contacting the voter. The Crandall ballot was a "legal vote" rejected under *N.J.S.A.* 19:29–1(e). A notarized statement by Dr. Crandall was delivered to the Court waiving any privacy and authorizing the opening of her ballot.

Despite the objection by respondents' attorneys, the court today opened Dr. Crandall's ballot which indicates that she voted for Siegel and Grasmere.

The court opened the ballot because a person who votes by absentee ballot obviously expects his or her votes to be counted. Improper actions by election officials cannot abrogate the right of all candidates and the public to have all legal votes counted. Since the court had it in its power to determine for whom the rejected voter voted, it did so. This decision does not involve the right to privacy or lack thereof; rather it involves the right of an absentee voter to have his or her vote counted.

D. *Absentee Voter Who Died before Election Day.*

*N.J.S.A.* 19:57–30 provides:

*Whenever it shall be made to appear by due proof to the county board that an absentee voter who has marked and forwarded an absentee civilian voter's*

ballot or military service ballot as provided in this act *has died prior to the opening of the polls on the day of the election such ballot shall be rejected* by the county board and retained by the county board in the same manner as provided herein in cases of other rejected ballots. [Emphasis added].

Because of illness, Wesley Mersfelder applied for an absentee ballot, which was approved by the County Clerk on November 4. He died of "coronary atherosclerosis" at St. Barnabas Medical Center at 6:18 p.m. the night before the election. On election day his absentee ballot was delivered by his messenger Karla J. Squier (Deputy Superintendent of Elections) to the Board of Elections at 6:58 a.m. Since there is no proof that the Board was aware of his death, they properly counted his ballot.

## V.

### AN ILLEGAL VOTE (NON-RESIDENT) WAS COUNTED.

Petitioner contends that Patrick Tevlin was not a resident of Maplewood when he voted in the subject election and thus was not eligible to vote.

*N.J.S.A.* 19:4–1 states:

... Every person ... shall have the right of suffrage and shall be entitled to vote in the polling place assigned to the election district in which he *actually resides* and not elsewhere ... (Emphasis added).

The meaning of the phrase "actually resides" is the issue to be determined with respect to Tevlin's vote.

Traditionally, "resident" is not synonymous with "domicile". Generally, one may have more than one residence, but only one domicile. *Michaud v. Yeomans, supra,* 115 *N.J.Super.* at 205, 278 *A.*2d 537. However, for purposes of *N.J.S.A.* 19:4–1, "residence" is equated with "domicile", *State v. Benny,* 20 *N.J.* 238, 119 *A.*2d 155 (1955); *State v. Atti,* 127 *N.J.L.* 39, 21 *A.*2d 603 (Sup.Ct.1941).

The term "domicile" actually connotes "home". *Stout v. Leonard,* 37 *N.J.L.* 492 (E. & A. 1874). For domicile, it is necessary that there be an intention not only to live at the

place, but also to make a home there. *Michaud v. Yeomans, supra,* 115 *N.J.Super.* at 205, 278 *A.*2d 537.

Therefore, for a person to "reside" within the meaning of the statute the place must be a "fixed domicile", *Brueckmann v. Frignoca, supra,* 9 *N.J.Misc.* at 129, 152 *A.* 780, the place where he "has and maintains his permanent home". *In re Petition of Hartnett, supra,* 163 *N.J.Super.* at 263, 394 *A.*2d 871; *Application of Langbaum, supra,* 201 *N.J.Super.* at 491, 493 *A.*2d 580.

The court in *Mercadante v. City of Paterson,* 111 *N.J.Super.* 35, 266 *A.*2d 611 (Chanc.Div.1970) held that among the factors which are important in determining domicile of a person who has more than one residence "are the physical characteristics of each, the time spent and the things done in each place, the other persons found there, the person's mental attitude toward each place and whether there is or is not an intention, when absent, to return. *Restatement,* Conflict of Laws, § 13c." *Id.* at 39–40, 266 *A.*2d 611. "Nothing less will create that 'identity with the community.'" *Id.* at 40, 266 *A.*2d 611. [ (Quoting *State v. Benny,* 20 *N.J.* 238, 252, 119 *A.*2d 155 (1955) ].

"The domicile is the place of his abode where he has the present intention of remaining and to which, if absent, he intends to return." *State v. Atti, supra,* 127 *N.J.L.* at 41–42, 21 *A.*2d 603. Although a person may have another place of residence somewhere, the place in which he has a present intent to remain will determine domicile for voting purposes.

The State has the right to limit the franchise to vote to bona fide members of the community. *N.J. Const.* (1947), Art. II, ¶ 3; *State v. Benny, supra,* 20 *N.J.* at 251, 119 *A.*2d 155; *Tp. of New Hanover v. Kelly,* 121 *N.J.Super.* 245, 249, 296 *A.*2d 554 (Law Div.1972); *Perri v. Kisselbach,* 34 *N.J.* 84, 87, 167 *A.*2d 377 (1961).

The statutory right to vote is not absolute and is subject to limitations. *Mulcahy v. Bergen County Board of Elections,* 156 *N.J.Super.* 429, 383 *A.*2d 1214 (Law Div.1978).

Illegal voters cannot demonstrate the "genuine desire to accept the responsibilities incident to such status" as set out in *State v. Benny, supra.*

 Tevlin, a registered Democrat, resides at 51 Riggs Place, South Orange. He was raised at 15 Girard Place, Maplewood, his residence when he first registered to vote on October 2, 1983. He has voted in seven Democratic primary elections but only four general elections.

Despite Tevlin's protestations of continued Maplewood residency, overwhelming documentary evidence and his actions, the official changes of address he filed with his employer, credit card companies, banks, insurance carrier, the telephone company, the State of New Jersey, and statements made by him at the polls clearly rebut his naked claim to residency in Maplewood.

Tevlin admits that he has maintained a residency at 51 Riggs Place, South Orange, with his brother. Together they occupy a second floor apartment which is leased in his brother's name. He maintains his own bedroom and has his clothes and belongings at that address. Since the early summer of 1991, he has maintained a listed telephone number at that address and no other. He admits that prior to the September 1991, school term he informed the school where he is employed that his official address and for publication in the school directory was South Orange. Although subpoenaed to produce his bank records, checking statements and credit card billings, he failed to produce them because he said that he always put them "in the garbage." He does admit to paying $250 a month rent, starting sometime in 1990, and is sure that since February 1991, he has regularly paid $250 a month rent. He testified that during May or June 1991 he decided to "formalize" his residency in South Orange.

The address he provided to the Market Transition Facility, his automobile insurance carrier, for computation of his premiums, billing and listing of his residence is 51 Riggs Place. Said

policy which became effective July 30, 1991 shows the South Orange address.

Tevlin's father testified that it was after the election that Tevlin decided to change his voting registration to South Orange. However, it was not until after commencement of this litigation that Tevlin filed a change of address form with the Superintendent of Elections showing his transfer to 51 Riggs Place.

Despite all this, Tevlin still insists he was a resident of Maplewood at the time of the election. He cannot show he pays rent to his parents in Maplewood, although he claims to sometimes barter for it. He does not maintain at the Maplewood address, a telephone, any bank accounts, his car registration or insurance nor does he provide that address to the graduate school he is attending as the address for mailing his transcripts.

Tevlin could have obviated the proceedings, the problems and the questions that have arisen if he had complied with *N.J.S.A.* 19:4–4.1. This statute provides that if a person who is entitled to vote has more than one place of residence, he may file his statement of dual domicile, electing and selecting one residence. Tevlin did not do so.

Residency is a declaration of intent to assume one residence and abandon another. It can occur in various ways and particularly by operation of law. For example, *N.J.S.A.* 39:3–4, dealing with registration of a motor vehicle, requires the owner's residence address:

> ... Such registration shall be made in the following manner: An application in writing, signed by the applicant or by an agent or officer, in case the applicant is a corporation, shall be made to the director or his lawful agent, on forms prepared and supplied by the director, *containing the name, street address of the residence or the business of the owner, mailing address, if different from the street address of the owner's residence or business, and age of the owner* ... (Emphasis added).

The registration for Tevlin's motor vehicle, dated July 1991, shows 51 Riggs Place as his residence which he provided to the

State of New Jersey. It is also shown on his insurance and title documents.

The State of New Jersey insists on immediate notification of a change in that residence. No change has been made since July 1991. The provisions of *N.J.S.A.* 39:3–36 provide that:

The registered owner of a motor vehicle or a motorized bicycle and a licensed operator shall *notify the director of a change in this residence within one week after the change is made* ... (Emphasis added).

It is clear that Tevlin, having abandoned his Maplewood residence, sought to establish his residence in South Orange by the lease and his physical presence in South Orange. Although one may wonder from his testimony when this occurred, his declaration to the State of New Jersey by his change of residence on his registration and insurance was made in July of 1991. The documents speak for themselves, and the change of residence occurred by operation of law—declaration and intent of abandonment.

The most telling evidence is Tevlin's statements to the judge of the district board of elections *after* he voted on election day.

Helen Prosser lives in the neighborhood where Tevlin was raised. Her testimony and Tevlin's does not basically differ, except Tevlin has a different recollection than Mrs. Prosser as to when it occurred. Tevlin said the conversation occurred before voting while Mrs. Prosser stated unequivocally that the conversation occurred after he voted. She was a very credible witness whereas Tevlin was not.

Mrs. Prosser indicated she was not working the books, as Tevlin stated, but that she was sitting off to the side of the table doing paperwork. After voting, Mrs. Prosser said Tevlin walked over to her to say hello. Tevlin told her he had moved in June and lived at Riggs Place, South Orange.

As the conversation continued, Mrs. Prosser testified that Tevlin said, "My mother told me I shouldn't vote and I should have changed my (voter) registration." Mrs. Prosser did not

reply. The discussion continued about his brothers and sisters, their health, well-being and marital status.

After Mrs. Prosser testified, Tevlin did not retake the witness stand to deny those statements, deny his admissions nor was any evidence placed on the record to contradict those statements. Despite a subpoena issued to Tevlin's mother, an employee of the Superintendent of Elections, she never came forward. She claimed to be ill and unable to attend the trial. After she was well and the court reopened the case to permit Balls to testify, no request was made to have her testify. No proof was offered by the Respondent Ryan to deny the admissions that Mrs. Prosser testified that Tevlin made.

The Court has had the opportunity to observe Tevlin's demeanor, testimony and the documentary evidence and concludes that his testimony is clearly unbelievable.

Respondent Ryan's reliance upon *Friends of Jim Usry v. Matthews, supra,* in an attempt to validate Tevlin's vote, is misplaced. In that case there was "no allegation that the disputed voters were not entitled to vote because they failed to satisfy any substantive requirement of registration; specifically, residency in Atlantic City." *Id.* 187 *N.J.Super.* at 181, 453 *A.*2d 1360.

The irregularity alleged herein, non-residency in Maplewood, is a material one where the irregularity in the *Usry* case was not a material one (moving between election districts more than 20 days before the election and failing to file a change of residence form).

Petitioner was unsuccessful in serving a subpoena upon Tevlin at either the Maplewood or South Orange address. However, his father was aware of the attempt and came to court. It was only after this court stated that a bench warrant would be issued that Tevlin's father requested time to produce his son. Clearly Tevlin did not want to testify, found it necessary to bring an attorney with him and was not believable when he testified.

The unavailability of Tevlin's records (credit cards, checking and banking) because they allegedly were thrown away raises a specter of dishonesty. The court does not believe everything was "put in the garbage."

The case law, while giving great weight to the intention of the voters, indicates that it is the voter's actions which are conclusive. *Perri v. Kisselbach, supra,* 34 *N.J.* at 88, 167 *A.*2d 377; *Michaud v. Yeomans, supra,* 115 *N.J.Super.* at 205, 278 *A.*2d 537.

Tevlin's intent to abandon his Maplewood residency and assume a South Orange residency is demonstrated by his actions. (*Acta non verba*—deeds not words).

*N.J.S.A.* 19:4–1 states:

Every person ... shall have the right of suffrage and shall be entitled to vote in the polling place assigned to the election district in which he *actually resides* and not elsewhere. (Emphasis added).

Based upon Tevlin's actions at the polls and elsewhere, the court finds by the preponderance of the evidence that he was not a Maplewood resident on November 5, 1991, and not eligible to vote in this election. Therefore, his vote is declared a nullity and excised.

After Tevlin testified he was asked to sign the name or names of the contesting candidates for the Township Committee, Siegel or Ryan or both, for whom he voted and insert the paper in an envelope which was then sealed and held by the court. When the court opened that envelope, the paper indicated that Tevlin wrote Siegel (and not Ryan). He later testified that he also voted for Grasmere.

No one can tell with certainty for whom Tevlin voted on the machine. It can only be determined by circumstantial evidence. This means that the court has to weigh Tevlin's testimony together with all other actions and statements to determine if it is credible or believable that he voted for Siegel.

Petitioner in his post-trial brief states that Tevlin's "testimony is highly suspect if not false, including perhaps for whom he claims to have voted, which is yet to be examined." How true!

Credible evidence means evidence which in the light of reason and common sense is worthy of belief. In order to be believable, testimony should not only proceed from the mouth of credible witnesses but it also must be credible in itself. It must be such that the common experience of men and women can approve as probable in the circumstances.

Here, there is not one iota of documentary evidence or believable testimony that would show that Tevlin voted for both Republican candidates, as Tevlin testified. His allegiance to the Democratic party is historically demonstrated. He voted in seven Democratic primary elections, but never voted in a Republican primary election. The only factor to be weighed in his favor in determining his credibility is that he is the dean of a prestigious secondary school. That one fact is outweighed, however, by his other actions and misrepresentations to the court. Prior to opening the envelope showing Tevlin's vote, the Court determined that he was not a believable witness. No testimony today changed that opinion.

Because Tevlin claims that he destroyed all his financial records, petitioner could not determine whether or not Tevlin contributed to Ryan's or Siegel's campaign or any other Democratic or Republican campaign. Now Tevlin, by falsely stating that he voted for Siegel, attempts to take *TWO* votes away from Siegel, *i.e.,* instead of having one vote taken from Ryan for whom he already cast a vote, he deviously attempts to take one vote from Siegel.

If the court had to accept the naked statement of every illegal voter as to the candidate for whom he voted, it would encourage illegal voting because an illegal voter, if challenged, would be able to get credit for two votes (one for his candidate and take one from the other candidate), whereas a lawful voter can cast only one vote.

The court granted Siegel's request to take testimony regarding Tevlin's vote. Before hearing testimony Siegel's attorney requested an order for sequestration of witnesses, which Ryan's attorney opposed.

Sequestration is designed to exercise a restraint on witnesses "tailoring" their testimony to that of earlier witnesses. It aids in detecting testimony that is less than candid and prevents improper attempts to influence the testimony in light of that already given. *Geders v. U.S.*, 425 *U.S.* 80, 87, 96 *S.Ct.* 1330, 1334, 47 *L.Ed.*2d 592 (1976).

The separation and exclusion of witnesses is fundamental to the concept of a fair and impartial trial. The process has long been recognized as an important method for discovering truth and detecting and exposing falsehood. Use of this rule has been recorded in the scriptures and can be traced as a trial tactic throughout the development of modern law. 6 *Wigmore, Evidence* (Chadbourn rev., 1976), § 1837, p. 455, *et seq.*

In neither statutory law, case law[4], Court Rules or Rules of Evidence does New Jersey have a specific provision setting forth guidelines to govern the sequestration of witnesses in a civil action. It is one of the few states that fails to do so. *Id.* at pgs. 458–461, Footnote 11. In criminal law, however, New Jersey has an abundance of case law which deals with the topic. *See State of N.J. in interest of W.O.*, 100 *N.J.Super.* 358, 242 *A.*2d 17 (App.Div.1968).

*Federal Evidence Rule 615* gives a litigant the right to have witnesses excluded from the courtroom except for three categories, which are not involved herein. 4 *Jones on Evidence*, 1991 Supplement, § 23:15.

---

[4]After this decision, the Supreme Court discussed the purpose of sequestration in *Morton Buildings, Inc. v. Rezultz, Inc.,* 127 *N.J.* 227, 603 *A.*2d 946 (1992), and referred the "consideration of the adoption of a Rule like Federal Rule 615" to the Committee on Civil Practice. (603 *A.*2d at 950).

■ An exercise of sound discretion ordinarily requires that a motion for sequestration be granted. In order to uphold the denial of a timely motion for sequestration there must be a sound basis. *State v. DiModica*, 40 *N.J.* 404, 413, 192 *A.*2d 825 (1963).

■ There is no reason for a distinction between civil and criminal cases; successful perjury is an equally deplorable result, in whatever form it overwhelms its victims. 6 *Wigmore, Evidence* (Chadbourn rev. 1976), § 1839, p. 470. The rule of sequestration articulated in criminal cases applies equally in a civil case.

Therefore, the court ordered sequestration of witnesses, including Siegel and Ryan, even though they were interested in the proceedings, because they were potential witnesses. It is the public's interest that is to be protected in this case.

■ Tevlin's testimony today created even greater doubts as to his veracity. He came with his attorney, appeared nervous and scared. While testifying his hands constantly moved below the witness stand. He did not recall the names of the candidates for Township Committee, did not remember how many people for whom he voted except Grasmere and Siegel. He tried to justify his "Republican votes" because he found the government to be doing a good job. However, he admitted that he knew that the governing body had denied his father a promotion in the Fire Department just before the election. He denied discussing the case with his parents after his original testimony. Yet he came to court with his attorney attempting to avoid testifying.

Petitioner also called Tevlin's father to testify, which further diluted Tevlin's credibility. It established that five members of the household where he claimed to have resided were registered Democrats, that his father was a fireman in Maplewood and a member of a union (and former officer) which placed advertisements in the News–Record of Maplewood and South Orange, twice before this election, opposing Republicans Grasmere and

Siegel, (which Tevlin denied knowing), that his father had handed out campaign literature for Ryan, that his father discussed with him being given a promotion years ago but did *not* discuss being denied a promotion just before this election. Tevlin's denial of knowledge of these facts belies credibility.

The evidence is clear that Tevlin lied when he declared in court that he cast a vote for Siegel and not Ryan.

Therefore, one vote is deducted from Ryan's total of 2,973, reducing it to 2,972.

## VI.

### THE MALFUNCTIONING OF THE VOTING MACHINES PROBABLY DID NOT CAUSE THE REJECTION OF LEGAL VOTERS.

The machines utilized in Essex County are AVM (Automatic Voting Machine Co.). They contain an important improvement called a "print-pack", by which the results and numbers at the opening and closing of the polls are printed onto sheets of "NCR paper."

Each election machine, pursuant to the statute, has built into it a number of safeguards, as does the election process, to ensure security and accountability of the votes. Each machine has on it a "public counter" which is a counter which can be viewed and reset after each election. At the commencement of an election, it is set at zero. As a person enters the voting booth and closes the curtain the public counter advances half a number forward. After the vote is cast and the curtain is reopened, the public counter advances another half to reflect that one voter has entered the voting booth. *N.J.S.A.* 19:48–1(k) and 19:48–6.

In addition to the public counter, there is a "life time" protective counter which is similar to an odometer in a car. This counter cannot be zeroed out after an election, and it advances a whole number each time the curtain is opened and

closed in any instance. Before the machines leave the warehouse, representatives of the Superintendent's office are required to sign a certification setting forth the life time protective counter number before the machine is shipped to the polling place, which was not done. After the machine is shipped to the polling place the district board workers are responsible for writing down the "opening" life time protective counter number before voting commences. At the conclusion of voting the district board writes down the "closing" protective counter number. The opening life time protective counter number subtracted from the closing life time protective counter number reveals a number which should equal the public counter number. This is a second safeguard in the election process.

Both the public counter and protective counter numbers are printed out on the sheets before and after the election.

If the machine is working properly, the public counter prints zero at the beginning and the total number of voters at the close. The lifetime protective counter begins where it last left off; this number is written down before the opening and the new number at the close. The difference must equal the public counter number.

Finally, before each voter votes, he or she is issued a voting authority, which is a serially-numbered piece of paper which indicates the voter's name and ascribes to him or her that number. The numbers commence with number "001". At the end of the voting, the total number of voting authorizations, the total public counter number and the difference between the opening and closing lifetime protective counter numbers all must match in order to ensure the security of the election process. (*N.J.S.A.* 19:52–2.1).

A re-examination of the voting machines during the recount disclosed that numbers of the outside public counters do not match the difference of the protective counters on four of the voting machines used. The protective counters for Districts 3, 4, 11 and 22 exceeded the public counters by 33. The County

Clerk had Joseph Fernicola count the voting authority slips signed by the voters in those districts and they equalled the protective counter numbers as reported.

The Superintendent of Elections has the duty to supply the machines in good repair pursuant to the provisions of *N.J.S.A.* 19:48–4. He must ensure that they are properly zeroed out prior to the election and they are supplied in proper working order under *N.J.S.A.* 19:48–6. If a machine is not properly working, he must "substitute a machine in *perfect* mechanical order for the damaged machine." *N.J.S.A.* 19:48–7.

Michael Scanlon, chief mechanic for the Superintendent of Elections in charge of voting machines, testified that his four workers were supposed to check the inside counter against the outside public counter before the election. However, despite the fact that there had been problems with the inside public counters in the last two elections, there is no proof that the machines were checked. He further testified that, despite petitioner's request, he did not know if anyone made a written report of testing stating that the machines are "... in every way properly prepared for the election" prior to this election as required by *N.J.S.A.* 19:48–6.

No written certification was ever prepared.

Petitioner also requested the Board of Elections to produce the certificate of approval of the Secretary of State that the voting machines met the requirements of *N.J.S.A.* 19:53A–3, as required by *N.J.S.A.* 19:53A–4. Ms. von Nessi could not find such approval because she said it was obtained so long ago. Failure to produce the certificate of approval does not vitiate an election.

During the trial Scanlon examined the malfunctioning machines and found that, upon opening the machines, all the public counters on the inside of the machines matched the protective counters; so he concluded that no candidate lost or gained any votes because of the malfunctioning machines. He indicated that he has been aware, at least in the last two elections, that

problems existed with the interior workings of the voting machines and the counters, which are the same problems that happened here.

Exhibit P–30 is the latching and clutching mechanism for advancement of the interior public counters and similar to the ones for the vote counters. The testimony of the chief mechanic was that there are a series of straps running from the interior public counter in each of the voter counters down into a "lever groove." The chief mechanic testified that he has had problems in the past elections and with this election with the strapping mechanism advancing the counters. He further testified that the exterior public counters and the lifetime protective counter have direct mechanical linkage and not straps, as do the interior public counter and vote counters, so they do not have problems with them.

As is evidenced from the test that was run during the trial for the machines in Districts 4 and 11, the machines failed to properly register through the strapping linkage in the interior counters of the machines.

Both Respondent Ryan's attorney and the Deputy Attorney General assert that if the direct mechanically linked exterior public counter and lifetime protective counter (with no strapping mechanisms) have numbers which equal the total number of voting authorities issued to voters to enter the voting machine, then no problem can exist. It is not that simplistic.

Petitioner is not asserting that there were more votes registered than there were voting authorities issued to voters (an over-vote). Petitioner is asserting that, despite the fact a certain number of voters ("a value x") entered the machine and attempted to cast their votes, the interior strapped linked public counter *and strapped linked voter counters* did not tabulate and register *all* the votes of the voters who went into the machine. In fact, Petitioner alleges, as is shown in the stipulation, Exhibit J–1, that in District 3 by the failure on the interior public counter there is a vote loss of at least one (x–1); that in

District 4 there is a fall off of nine (x–9); that in District 11 there is a fall off of seventeen (x–17); and that in District 22 there is a fall off of six (x–6).

In these four districts there is an inability to account for thirty-three voters. Petitioner contends that it is immaterial how many voting authorizations were issued, since he alleges, not that the vote totals in the interior exceed the voting authorities but, that there is a failure to account for those totals—a fall off.

As a result of the court's requested examination and determination, there is no consistency in the four machines as to their failure to in fact "drop numbers" or "fall off". In Districts 3 and 22 when 11 test votes were added to the machines, the machines properly registered 11 additional votes and 11 additional numbers on the interior public counters. That would suggest that the problem with the machines is not mechanical, but that they were not properly zeroed out at the start of the election. There may be other explanations.

When 11 test votes were added to the machine in District 4, it registered 11 additional votes but only 10 votes in the interior public counter. When 11 test votes were added to the machine in District 11, it registered 11 votes but only 2 on the interior public counter. Based upon the testimony and the results of these tabulations, the machines in Districts 4 and 11 were broken and not properly functioning. Every vote "added" to the four machines (on other candidate wheels than those involved in this election) was properly recorded on each machine.

In the matter of *In re Application of Abbott Low Moffat,* 142 *N.J.Super.* 217, 222, 361 *A.2d* 74 (App.Div.1976), certif. den., *sub nom, Princeton Tp. v. Bleiman,* 71 *N.J.* 527, 366 *A.2d* 682 (1976) it was established through expert and lay testimony that a problem existed with regard to a five vote error in the machine. The court found that the machine was "obviously defective."

As the trial court held and the Appellate Division sustained:

... it is *highly probable* that the people who voted for Ms. Lependorf voted for Moffat or at least a sufficient number of them did so so as to affect the outcome of this election. *Id.* at 222 [361 *A.*2d 74]. [Emphasis added].

The court went on to hold that:

That legal votes were rejected here is beyond doubt. Not only was there proof of five unregistered votes for Moffat but there is also the *fair inference* that others were likewise unrecorded, in view of the fact that 100 votes were cast for Moffat's running mate as against only 31 and 16, respectively for the opponents. *Id.* at 223–224 [361 *A.*2d 74]. [Emphasis added].

In District 3 Siegel trailed his running mate by 20 votes. In District 4 Siegel trailed his running mate by 9 votes. In District 11 Siegel trailed his running mate by 11 votes. In District 22 Siegel trailed his running mate by 10 votes.

This is an existing and continuing problem that the Superintendent of Elections knew about and apparently did nothing to correct. It was a problem endemic to the entire County of Essex and at least seven other municipalities. Petitioner contends that there is a "fair inference", as found in *Moffat*, that the machine results do not display and provide a full, free and fair expression of the electorate of the Township of Maplewood.

While there was proof of a problem regarding the interior public counters on these machines, there was no proof of defect or malfunction regarding the candidate counter mechanisms. This is the distinction between the case at bar and *In re Application of Abbott Low Moffat, supra.* In that case the defect was proven and the extent of its impact was inferred. Here, petitioner seeks to have the Court infer a defect from testimony about a separate (and only partially related) function. The public counters on a voting machine are activated by the opening and closing of its curtains. The candidate counters are activated by the levers in the voting booth. These functions, while similar in part, are separate in the final analysis. The county's mechanic testified that a defective public counter would not *necessarily* be proof of a problem in tallying the votes cast on a machine. Thus, he cast some doubt as to the effect of the defective public counter.

Petitioner's request to have this court perform an analysis similar to that done in *Moffat, supra,* overlooks the fact that this record provides the court with insufficient evidence on which to base any inference. In *Moffat,* the petitioner's miniscule vote totals were contrasted both with large numbers of voters using the machine and with the candidate's running-mate's showing. Here there is no such statistical analysis. Therefore, the court cannot infer that Siegel would have fared any differently in the four election districts under review than he did (a) as shown on the tally sheets for those four districts or (b) elsewhere.

A cloud hangs over this election because the malfunctioning of machines in four districts may have caused votes to be lost. However, the court is not satisfied by a preponderance of the evidence that votes probably (more likely than not) were, in fact, lost.

## VII.

### THE ACTIONS AND INACTIONS OF THE COUNTY CLERK, DISTRICT BOARD MEMBERS AND ELECTION OFFICIALS HAVE DENIED A FULL, FREE AND FAIR EXPRESSION OF THE WILL OF THE VOTERS AND CONSTITUTIONAL PROTECTIONS.

Respondent directs the Court's attention to *N.J.S.A.* 19:3–9:

When upon the trial of any action or proceedings instituted under this Title for the purpose of securing a determination that any nomination for or election to any public office or party position is null and void, it shall appear from the evidence that the offense complained of was not committed by the candidate, or with his knowledge or consent, and that all reasonable means were taken by or on behalf of the candidate to prevent the commission of any such offense, or that the offenses complained of were trivial or unimportant, and that in all respects his candidacy and election were free from all illegal acts, or that any act or omission of any candidate complained of arose from accidental miscalculation or from some other reasonable cause of like nature, and in any case did not arise from any want of good faith, and *under the circumstances it seems to the court or judge to be unjust that the candidate shall forfeit his nomination, position or office,* then the nomination or election of such

candidate shall not by reason of such offense complained of be void. (Emphasis added).

The provisions of *N.J.S.A.* 19:3–9 are found within an article entitled "Void Nominations or Elections." The provisions of *N.J.S.A.* 19:3–7 deal with the failure of a candidate or an office holder to file reports, campaign contributions reports, financial statements or an oath of office. By failing to file, the nomination or election can be declared null and void.

The provisions of *N.J.S.A.* 19:3–8 (repealed in 1973 by the enactment of the provisions of *N.J.S.A.* 19:44A–1 *et seq.*, the New Jersey Campaign Contributions and Expenditures Reporting Act) dealt with a forfeiture of office due to excessive or unauthorized campaign expenditures in an election.

The last section of that article is *N.J.S.A.* 19:3–9.

Those three sections must be read in *pari materia.* The saving provisions, if any, under *N.J.S.A.* 19:3–9 apply to the failings under *N.J.S.A.* 19:3–7 in the filing of the Oath of office or any reports and the repealed, *N.J.S.A.* 19:3–8.

The provisions apply only to an "offense" because *N.J.S.A.* 19:29–1 governs the rejection of legal votes and receipt of illegal votes.

Even if *N.J.S.A.* 19:3–9 were applicable, the respondent never raised it as an affirmative defense in his answer. Pursuant to the provisions of *N.J.S.A.* 19:29–5 (proceedings shall be similar to those in a civil action), the failure to plead the affirmative defense would constitute a waiver under the rules of court.

In order for the statute to apply it must "*... appear from the evidence ...*" that the exoneration of the respondent can clearly be posited. Respondent has the burden of proof to demonstrate that he falls within the ambit and protections of the statute.

The numerous errors made by election officials, considered collectively, were not trivial or minor irregularities, as they were to void an election in *Friends of Jim Usry v. Matthews, supra,* 187 *N.J.Super.* at 182, 453 *A.2d* 1360.

It is not unjust under these circumstances for Ryan to be deprived of the office and have another election when his opponent, Siegel, had more legal votes.

The right to vote must include the right to have that vote counted and at its full worth. *U.S. v. Mosley,* 238 *U.S.* 383, 35 *S.Ct.* 904, 59 *L.Ed.* 1355 (1915). That right is lost if voters who are not entitled to vote are allowed, thus diluting the rightful voter. The right to vote is a federally protected right. *Griffin v. Burns,* 570 *F.*2d 1065 (First Cir.1978). *Donohue v. Board of Elections of State of N.Y.,* 435 *F.Supp.* 957, 965 (East Dis. N.Y.1976).

The commissions and omissions of the officials, non-officials and others who acted or failed to act and the overall color of the election demands that it be set aside.

The election laws have been created to deter fraud, safeguard the secrecy of the ballot and to preserve the enfranchisement of qualified voters. *In re Matter of Petition of Byron, supra,* 165 *N.J.Super.* at 474, 398 *A.*2d 599.

## SUMMARY

 There have been a series of violations of the election statutes. Although the actions and inactions were not done fraudulently by election officials, when taken in their totality they demonstrate that the result of the election must be nullified. A full, free and fair expression of the will of the people has been thwarted.

Four votes for Siegel (Ricca, Crandall, Sprague, Mollach) were illegally rejected, which increases Siegel's votes from 2,969 to 2,973. Tevlin's vote was illegal and has been rejected. Since the court has found that Tevlin voted for Ryan, this reduces Ryan's total to 2,972. As one cannot determine for whom Balls would have voted, his prospective vote is an open vote. *See Application of Murphy,* 101 *N.J.Super.* 163, 243 *A.*2d 832 (App.Div.1968). In making it an "open ballot" not counted for either, there is no presumption that an illegal ballot

is cast for the incumbent or the contestant. *See In re Clee,* 119 *N.J.L.* 310, 325–326, 196 *A.* 476 (Sup.Ct.1938). If Balls had voted for Siegel, Siegel would have been the winner, but if Balls had voted for Ryan, the election would be a tie. Therefore, there must be a new election because the court cannot determine the winner.

## CONCLUSION

The results of the November 5, 1991 election so far as they concern Ryan and Siegel are voided and the certification of election issued to Ryan is annulled. *N.J.S.A.* 19:29–9. Therefore, Ryan is removed from office. *N.J.S.A.* 19:29–10.

A new special election shall be held in accordance with *N.J.S.A.* 40A:16–16, not less than 45 days nor more than 50 days.